UNION PACIFIC RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 51530, 70183, 70219.   Promulgated April 16, 1935.

*Henry W. Clark, Esq.*, and *Harry J. Gerrity, Esq.*, for the petitioner.

*E. C. Algire, Esq.*, and *Gerald W. Brooks, Esq.*, for the respondent.

OPINION.—For each year the problem is presented of the proper treatment upon the consolidated return of the transportation by one affiliated corporation of the materials of another used in additions and betterments, the cost of which is capitalized. Unlike the transportation by a railroad corporation of its own men and materials, the transportation for another, even though affiliated under the revenue act, is covered by the published tariff rates and hence the earlier decisions treating of "transportation for investment—credit" are not entirely similar. Cf. *Great Northern Railroad Co.* v. *Commissioner*, 40 Fed. (2d) 372, affirming 8 B. T. A. 225; *Gulf Mobile & Northern Railroad Co.*, 22 B. T. A. 233; *Missouri Pacific Railroad Co.*, 22 B. T. A. 267. The decision in *Kansas City Southern Railway Co.*, 22 B. T. A. 949, does, in issue 24, discuss the transportation of intercompany capital freight, but upon a background of evidence so inadequate as to leave the opinion with but little force as an authoritative precedent.

Upon a consolidated return the determination of current consolidated taxable net income requires the elimination of intercompany transactions. *Old Mission Portland Cement Co.* v. *Helvering*, 293 U. S. 289; Regulations 65, art. 636; Regulations 69, art. 635; Regulations 74, art. 734; Regulations 75, art. 31. This means that the charges paid by the receiving company to the carrying company are eliminated from the consolidated gross income and deductions. Thus within the affiliated group is left the cost incurred by the carrying company in the transportation of the materials which are capitalized by the receiving company. To permit this cost to be deducted by the affiliated group as an operating cost would plainly be incorrect because it represents not an operating expense but a part of capital investment of the group. Hence the respondent insists that the cost of such transportation by the carrying company must be disallowed as a deduction upon the consolidated return; and the greater the cost, the greater the disallowance. With the principle of this the petitioner does not seriously disagree. The conflict between the parties lies in the method and extent of its application.

It is clear both from the evidence and in reason that the actual cost of such transportation can not be factually established by primary evidence from observation or knowledge. The best that can be done is to educe a figure by a statistical analysis of all of the accounting figures which have any bearing upon such transportation. Both parties agree that some sort of average ton mile transportation cost figure is the nearest approach available; but the method of

arriving at such a figure is the occasion of dispute. They agree upon the total number of ton miles of all freight in each year, and upon the total ton miles of intercompany investment freight for each year, and that the proper ton mile cost figure to be used results from taking the all freight ton mile figure as the divisor, and that the proper annual intercompany investment freight cost should be arrived at by using the aforesaid average ton mile cost figure as the multiplier. But the petitioner contends that the total dividend to be used in ascertaining the quotient of ton mile cost is the sum of what it calls " out of pocket costs ", such " out of pocket cost " being the aggregate of a group of transportation accounts called "Account IV Transportation Rail Line ", properly apportioned as between freight and passenger transportation. To this the petitioner half-heartedly concedes the possibility of adding an apportioned part of the maintenance accounts. The respondent, however, insists that the dividend to which the divisor of total ton miles must be applied is the total freight portion of all the accounts, including not only those which the petitioner has used, but also many general accounts, even those of interest on funded debt.

The primary position of the petitioner is that the cost of transporting intercompany materials is not determinable by any method of apportionment of transportation costs applicable to freight generally. It insists that the experience of its officers indicates that the cost of transportation of intercompany freight is substantially less than a proportionate part of the cost of transportation of all freight. To this effect it introduced the testimony of three of its officers, who expressed these views and the reasons therefor. While such testimony is not without weight, it must still be regarded, not so much as evidence of fact which must be judicially accepted if uncontradicted, but as evidence of an opinion arrived at by a process of rationalization which may or may not be authoritative or convincing. Such evidence this Board is at liberty to weigh and perhaps disregard if its soundness a priori is not demonstrated or its factual premises not proven. The view of these witnesses is that since revenue transportation requires the carrier's facilities and operations in any event, and since the transportation of intercompany material is but incidental, the cost of such latter transportation must be regarded as only so much as exceeds the cost which would in any event be incurred. For this we can find no authority, and we have no hesitation in rejecting it as the theory upon which the cost figure should be determined. Cf. *Northern Pacific Ry. Co.* v. *North Dakota*, 236 U. S. 585.

By the petitioner's method of apportioning " transportation rail line " accounts as between passenger and freight and dividing the

figure by ton miles of all freight, it arrives at an average ton mile cost figure for the Union Pacific of 2.3411 mills, and similar figures for the other affiliated companies. These figures we are unable to adopt, and we are likewise unable to approve the higher figure computed by the petitioner by adding a proportion of the several maintenance items. We think that these figures do not go far enough to reflect the cost of transporting the capitalized material.

On the other hand, those of respondent go too far. The difficulty lies in determining what items of the carrier's cost accounts should be excluded because not reasonably related to the cost of transporting intercompany freight. It seems probable, for example, that the large item of interest on funded debt and that of railway tax accruals have little or no relation to such transportation. At least, without more information on the subject than this Board has been given, we could not say from the bare title of the account and the information about it which is contained in the classification of the Interstate Commerce Commission, that these two items reflect intercompany material transportation cost.

Between these two extremes we find ourselves unable to identify the accounts which do reflect such cost or to adopt with assurance any method by which such allocated cost figure is to be computed. It is not enough that the Commissioner insists upon the inclusion of every account, for, in the first place, this is not the method which he used in the determination of the deficiency, and, in the second place, it seems obviously too extreme to justify its approval. In these circumstances the general rule of the burden of proof falls short of a solution, *Helvering* v. *Taylor*, 293 U. S. 507. The problem thus becomes one of arriving at the best practical figure to be used consistently with the evidence.

The petitioner placed in evidence a certified copy of an official direction of the Director of Valuation of the Interstate Commerce Commission, to the effect that every carrier would be permitted to make a fair charge on its books representing the expense of transporting its own construction material, and that only when the amount exceeded 7 mills per ton mile would the carrier be required to substantiate it. This may fairly be interpreted as a presumptive approval by the Commission of the 7-mill rate as not excessive for the purposes of valuation. This figure is in some instances more, and more often less, than that resulting from the respondent's method if the items not classified as operating expenses and those unapportioned to freight or passenger service be excluded from the computation. Although not binding, *Old Colony R. R. Co.* v. *Commissioner*, 284 U. S. 552, it seems to provide a fair figure for the present purposes, and in the present record we can find nothing bet-

ter. It is true, as both parties say, that the Interstate Commerce Commission applied the figure only to company freight and that the present controversy relates to intercompany freight, such freight being carried at tariff rates. It is, however, not unreasonable to import this figure into the computation of the consolidated tax of an affiliated group, not because the affiliated group is regarded as a taxpayer, an outmoded concept, see *Woolford Realty Co.* v. *Rose*, 286 U. S. 319; *Delaware & Hudson Co.* v. *Commissioner*, 65 Fed. (2d) 292, but because the analogy may properly serve our present purpose and thus permit of the use of the only satisfactory available figure. Furthermore, since whatever figure is used will *pro tanto* become a factor of the depreciation base as well as the basis for future gain or loss, the possible inaccuracy of the figure will presumably be ultimately washed out.[1]

We therefore hold, upon the present record, that in the determination of the consolidated taxable net income for each of the years in question, there shall be eliminated the amount charged by the carrying company to its affiliates for the transportation of company materials, and that the deduction representing the cost of operation shall be reduced by excluding therefrom a figure arrived at by applying the rate of 7 mills a ton mile to the stipulated number of ton miles of such intercompany transportation.

## II.

### EXCHANGE OF SEATTLE LOTS.

FINDINGS.—In December 1925 the Oregon & Washington Railroad Co., one of the affiliated group, transferred lots 1 and 2, block 321, Seattle Tide Lands, to the Denny-Renton Clay & Coal Co. in exchange for lots 4 and 19 and the northern 6 feet of lots 5 and 18, block 332. Neither the former nor the latter properties were held by the railroad company for productive use in trade or business or for investment. The cost to petitioner of lots 1 and 2 was $68,946.35. The fair market value of the property received in exchange was

[1] This is a type of controversy to which the judicial method is entirely unsuited. The problem is no doubt common to all the railroads in the country in its application to the cost of transportation of company material for investment, and is probably common to all the large systems in its application to intercompany transportation. There is little to be said for the determination of a cost figure varying with each company as to each year in accordance with the particular evidence which the intelligence and industry of counsel and witnesses makes available. Since there is an authoritative uniform classification of railway accounts, it would seem practicable by means of a general investigation by the Commissioner, common to all carriers, to secure the scientific aid of statisticians and cost accountants informed in the field of railroad accounting, to the end of determining either a universally satisfactory ton-mile cost figure or a uniform statistical method of computing the correct figure each year as to each taxpayer. The railroads are not transient taxpayers, and any inaccuracy would probably be recouped in the long run.

$14,175. Upon the exchange the petitioner sustained a loss of $54,771.36.

OPINION.—The petitioner claims a deduction for loss sustained in this exchange measured by the difference between the cost of the lots in block 321 and the fair market value when received of the lots in block 332. The respondent denies the deduction upon the ground that both the property given up and the property received were held for investment and that in such an exchange the Revenue Act of 1926, section 203 (b) (1)² prohibits the recognition of the loss. If it be held that the exchange is a transaction predicating the recognition of gain or loss, the parties are at odds as to the cost to the petitioner of the lots given up and as to the fair market value of the lots received.

1. From the evidence it appears that the railroad company originally acquired the lots in block 321 as part of a project for new line and terminals. Later, by reason of a joint facility arrangement with other carriers for the use of properties already constructed, the original project was discontinued and thereupon it became and has since been the continuing purpose of the railroad to dispose of the properties no longer needed. The lots were vacant and were apparently nonproductive. The railroad owned most of block 332, and made the exchange here in question in order to unify its holdings in that block, with the idea that thus they were more easily marketable as an industrial site.

The scheme of section 203 is, as a general rule, to recognize gain or loss upon the exchange of property and to provide for specific exceptions in situations which are expressly described. *Sarther Grocery Co.*, 22 B. T. A. 1273; *Arctic Ice Machine Co.*, 23 B. T. A. 1223; *Evert A. Bancker*, 31 B. T. A. 14. In such a scheme, a transaction is not lightly to be classed among the exceptions, irrespective of whether the effect has been a loss or a gain.

But the evidence here indicates no purpose either of productive use or of investment, but rather a purpose of liquidation with a minimum of loss. Unlike the holding of bonds considered in *Union Pacific R. R. Co.* v. *Commissioner*, 69 Fed. (2d) 67; 69 Fed. (2d) 966, there was no present yield to support an inference that the property was being held for income. The present case is an indication that there are circumstances in which property may be held,

---

² SEC. 203 (b) (1). No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment, or if common stock in a corporation is exchanged solely for common stock in the same corporation, or if preferred stock in a corporation is exchanged solely for preferred stock in the same corporation.

and that there are transactions, which elude the several classifications of section 203. When such situations occur they must be regarded within the terms of subdivision (a). In other words, if a catchall is to be found for nondescript sales or exchanges, subdivision (a) must serve the purpose. We are of opinion that subdivision (b) (1) is not applicable in the present case.

2. Since the exchange involves gain or loss, the question is, How much? We have found that the cost of the property given up was $68,946.35, and that the fair market value of the property received was $14,175. As to both of these figures, however, there is dispute. In considering the cost, the petitioner seeks to add to the amount a figure of $1,884.16 which it represents to be a proportion of the general cost, including certain salaries, of the negotiations and other activities involved in the acquisition of numerous properties required for its railway project. This figure, we think, may not properly be included in the cost, both because on principle the salaries may not be so included, and because the evidence is insufficient to prove the apportionment.

The fair market value of the property in block 332 is found as a fact upon a full consideration of evidence which includes prices in actual transactions involving property in the vicinity and opinions of witnesses more or less qualified to be helpful.

The petitioner, upon the consolidated return, may therefore properly deduct $54,771.36 as a loss sustained in this exchange.

## III.

### SALE OF BLOCK 394, SEATTLE.

FINDINGS.—By written " agreement " executed May 1, 1920, by the Oregon & Washington Railroad Co., called " vendor ", and the East Waterway Dock & Warehouse Co., called " purchaser ", for a consideration of $644,153.76, " the purchaser agree[d] to purchase from the vendor and the vendor agree[d] to sell and convey to the purchaser " block 394, Seattle Tide Lands, subject to a then existing lease of a portion thereof. The purchase price of $644,153.76 was to be paid, $25,000 immediately in cash, including the application of a certain credit; $25,000 on each first June, July, August, September, October, and November, 1920; $50,000 on each following first July and January of 1921, 1922, 1923, 1924, and January 1, 1925, and $69,153.76 on July 1, 1925, with interest on deferred payments at 6 percent. The purchaser was to keep the premises insured for the benefit of the vendor, upon failure of which the vendor might pay the premiums and be reimbursed by the purchaser. Purchaser was to repair, and to pay all taxes and assess-

ments, upon failure of which the vendor could pay and include the amount thereof in the purchase price, with interest. Purchaser was to comply with legal requirements as to use and save the vendor harmless in respect thereof. No improvements costing more than $500 were to be made without the vendor's written consent. The rent from the Swift leasehold was to be applied to the purchase price, except in case of forfeiture of this agreement. As to certain other existing leases, the terms thereof were suspended, subject to reinstatement in the event of forfeiture. The risks of certain railway and navigation facilities and operations were shifted from the vendor to the purchaser.

Default in performance of any of the purchaser's undertakings gave the vendor an election of a right of action for the unpaid portion or a forfeiture and reentry. Payments already made were to be forfeited as liquidated damages.

After full performance by the purchaser, including the payment of the entire purchase price, the vendor was to deliver a warranty deed conveying title.

The purchaser took possession May 12, 1920, and title was conveyed by deed dated October 16, 1926.

OPINION.—The petitioner contends that, for purposes of tax determination, the transaction must be regarded as sufficiently complete in 1920 to require the gain resulting therefrom to be included in its 1920 income, and that the respondent's determination and contention here that the transaction must be attributed to 1926, when the deed was given, can not be sustained. We think the petitioner is correct, since its accounts were kept on the accrual basis, *Commissioner* v. *Nibley-Mimnaugh Lumber Co.*, 70 Fed. (2d) 843 (App. D. C.). The question is not conclusively determined by the date of passage of title, but is more largely influenced by the petitioner's accrual of the purchase price and the transfer by it of the substantial burdens and benefits of ownership, *Charles J. Derbes*, 24 B. T. A. 276; 69 Fed. (2d) 788; *Birdneck Realty Corporation*, 25 B. T. A. 1084; *Dakota Creek Lumber & Shingle Co.*, 26 B. T. A. 940; *Standard Lumber Co.*, 28 B. T. A. 352. There can be no doubt that, in a proceeding affecting 1920, if the petitioner had sought to postpone the recognition of gain or loss, it would have failed, as the obligation for the deferred payments had accrued. Under no circumstances could it be said that the petitioner, although receiving the purchase price from year to year, was nevertheless entitled to postpone the recognition of gain therein until the delivery of the deed conveying title. However qualified might be the purchaser's right to and possession of the property prior to the transfer of title, there was no qualification of the vendor's right to the price.

Earlier decisions have held that, where the deed had been delivered in escrow, the transaction was attributable to the year of the contract, *Commissioner* v. *Moir*, 45 Fed. (2d) 356 (C. C. A., 7th Cir.); *Dakota Creek Lumber & Shingle Co.*, supra; *Harris Trust & Savings Bank, Executor*, 24 B. T. A. 498; *Old Farmers Oil Co.*, 12 B. T. A. 203; *Seletha O. Thompson*, 9 B. T. A. 1342. We think it makes little difference whether the deed be delivered in escrow or withheld by the vendor until the purchaser's full performance. In neither case does the purchaser acquire title, and the withholding thereof is, for tax purposes, no more significant in the one case than in the other.

The respondent argues that in any event the petitioner is estopped to deny the realization of gain in 1926, because it failed to include the gain in its return for 1920, and 1920 is now beyond his reach because of the statute of limitations. We find no evidence to support an estoppel, *Salvage* v. *Commissioner*, 76 Fed. (2d) 112; *Helvering* v. *Brooklyn City R. R. Co.*, 72 Fed. (2d) 274; *Sugar Creek Coal & Mining Co.*, 31 B. T. A. 344. There was simply an error of both the taxpayer and the Commissioner in omitting the income from the return and subsequent consideration of 1920. But 1920 was open to the Commissioner until long after the present proceeding was instituted. With a proceeding before the Board, *Union Pacific Railroad Co.*, 26 B. T. A. 1126; *Union Pacific Railroad Co.* v. *Commissioner*, 69 Fed. (2d) 67; *Helvering* v. *Union Pacific Railroad Co.*, 293 U. S. 282, directly involving 1920, to which the Commissioner was a party and in which it was available to him by affirmative pleading to demand inclusion of the gain in the petitioner's 1920 income, he nevertheless chose not to do so and instead to stand upon his determination in this proceeding that the amount was properly in 1926. Under these circumstances it is impossible to find that he has been misled or otherwise so imposed upon that the petitioner may not be heard to urge the correct determination of its 1926 deficiency.

## IV.

### SALE TO KANSAS CITY TERMINAL.

FINDINGS.—On June 27, 1917, for the purpose of providing terminal facilities in Kansas City, Missouri, the Union Pacific executed a written agreement with Kansas City Terminal Railway Co. to deliver immediate possession to the latter of certain real property, whereon the Terminal Co. should proceed at once to construct an elevated railroad line, and to convey title to said property upon pay-

ment by the Terminal Co. of the agreed purchase price, which was to be paid within two years with interest. Upon abandonment of the project by the Terminal Co. the property should revert to the petitioner and the purchase price should be repaid and a new construction and operation agreement should be executed. The vendee took immediate possession and completed construction in 1919. The vendor executed a deed which in 1919 was deposited with a trustee. The purchase price was not paid until 1925, interest being paid in the meanwhile. The deed was delivered in 1925.

OPINION.—Respondent determined a deficiency in respect of a gain from this sale in 1926, but both parties are now substantially agreed that the question to be determined is whether the gain should be recognized in 1925, when title passed, or in 1917, when the agreement was made. This question is essentially the same as that just considered in respect of block 394, Seattle. Strictly speaking, the question is only whether the gain may properly be recognized in any of the taxable years now involved in this proceeding, and more particularly in 1925, as the respondent insists. Since all of the substantial burdens and benefits of ownership had theretofore passed, the income should not be attributed to that year. Upon the accrual system the vendor had both the right and the duty to be taxed upon the gain at the time either of the execution of the contract or the due date of the payments. The Interstate Commerce Commission, considering this very property for valuation purposes, had held (44 I. C. C. Val. Rep. 1) that the property could not after 1917 be included among those of the Union Pacific.

As in respect of block 394, Seattle, we find no reason to hold the petitioner estopped to make this contention. There is no evidence of word or conduct by it misleading the respondent, but only of an erroneous omission from income of an earlier year. This is not sufficient. *Salvage* v. *Commissioner*, *supra*. Furthermore, the record shows that the door to the proper tax in 1917 was not closed at the time the present proceeding was instituted, since that year was involved in a proceeding pending before the Board, final order in which was not entered until 1931. Cf. *Union Pacific Railroad Co.*, 17 B. T. A. 793.

### V.

#### SALE OF TRACT IN MULTNOMAH COUNTY, OREGON.

FINDINGS.—In 1925 the Oregon-Washington Railroad & Navigation Co. sold a tract of land consisting of 87.9 acres in Multnomah County, Oregon, for $49,903.90, the fair market value of which on March 1, 1913, was $98,887.50, and sustained a loss of $48,983.60.

OPINION.—The only difference between the parties is as to the fair market value of the tract on March 1, 1913. They agree upon the sale price and have adjusted an earlier dispute as to the propriety of spreading the deduction for loss and the year in which it is to be recognized. From the evidence, consisting of the testimony of an experienced real estate dealer familiar with the tract and its surroundings and transactions in the vicinity and the field notes on file with the Bureau of Valuation of the Interstate Commerce Commission as of June 30, 1916, all of which has been fully considered, the foregoing finding has been made. The loss of $48,983.60 is deductible in 1925 and the deduction which has heretofore been allowed for 1926 in respect of this transaction should be disallowed.

## VI.

### INTERCOMPANY BOND DISCOUNT.

The facts in respect of this issue are all agreed upon and stated in a written stipulation, and it is unnecessary to set them forth here. Several of the affiliated corporations owned the bonds of other corporations within the affiliated group. These bonds had originally been issued at a discount. Upon the consolidated returns deductions were taken for annual amortization of such discount, which deductions have been disallowed by the respondent. As to 1924, 1925, and 1926, the respondent had allowed such a deduction as to the discount upon certain bonds, and he now claims, consistently with the disallowance in other instances, that this was erroneous and should now be corrected. The argument is entirely one of law which has now been completely disposed of by *Old Mission Portland Cement Co.* v. *Helvering, supra,* and *Gulf Mobile & Northern R. R. Co.* v. *Helvering,* 293 U. S. 295. The petitioners are entitled to no deductions for the amortization of discount upon bonds held within the affiliated group. The respondent's determination in this respect and his affirmative claim are in all respects sustained.

## VII.

### LOSS FROM RETIREMENT OF EQUIPMENT.

The facts are stipulated. In 1924 the petitioners retired equipment which had been acquired prior to January 1, 1909, at an original cost of $640,336.45. The salvage realized was $96,197.63. Of the depreciation, amounting to $519,560.94, stipulated to have been actually " sustained " from the time of acquisition until retirement, $245,241.50 was sustained prior to January 1, 1909, and $274,-

319.44 subsequently. Prior to January 1, 1909, the corporations accrued upon their books only $217,245.24. Upon their return for 1924, the taxpayers deducted as a loss the difference ($52,574.14) between original cost and the sum of depreciation accrued plus salvage. In the deficiency notice, the respondent increased the loss by disregarding the $217,245.24 depreciation accrued on the books before January 1, 1909. He now claims, by affirmative pleading, that the entire amount of $245,241.50, stipulated to have been the depreciation actually sustained prior to January 1, 1909, should have been taken into the computation, thus reducing the loss deduction to $24,577.88.

The controversy is simply whether the computation of loss must include or exclude the depreciation of the period prior to January 1, 1909, which is the effective date of the corporation excise tax—the first occasion for recognizing depreciation as a factor in the determination of a Federal tax. No question is suggested as to the period subsequent to January 1, 1909. The petitioner, we assume, used such annual depreciation as deductions in its excise and income tax returns, and raises no question as to the propriety of limiting its loss upon retirement by such amount as has already been deducted. See *United States* v. *Ludey*, 274 U. S. 295; *Even Realty Co.*, 1 B. T. A. 355. As to the depreciation of the earlier period, however, the proper computation of loss in 1924 requires the consideration of statutory language which is peculiar to the Revenue Act of 1924 [3]—language which is not found in any earlier statute and which is modified for the following year by the Revenue Act of 1926.

For any year prior to 1924, the determination of gain or loss upon the sale or disposition of depreciable property was governed by a statute which made no mention of an adjustment for prior depreciation. Whether depreciation should be taken into account in the computation and, if so, whether the measure of such depreciation should be the amount " sustained ", or the amount accounted for on the books, or the amount deducted on the returns, was a question upon which there was no consensus.[4] The Revenue Act of 1924 was

[3] Sec. 202 (b). In computing the amount of gain or loss under subdivision (a) proper adjustment shall be made for (1) any expenditure properly chargeable to capital account, and (2) any item of loss, exhaustion, wear and tear, obsolescence, amortization, or depletion, previously allowed with respect to such property.

[4] *United States* v. *Ludey*, 274 U. S. 295; *Ludey* v. *United States*, 61 Ct. Cls. 126; *N. C. & St. L. Ry. Co.* v. *United States*, 269 Fed. 351; *Ward* v. *Hopkins*, U. S. Tax Cases (2d Supp.) 1571 (D. C. Texas 2/27/24); *Even Realty Co.*, 1 B. T. A. 355; *Noaker Ice Cream Co.*, 9 B. T. A. 1100; *Deposit Trust & Savings Bank, Executor*, 11 B. T. A. 706; *W. B. Brooks*, 12 B. T. A. 31; *J. A. Talbot*, 23 B. T. A. 792; O. D. 600 (1920), C. B. 3, p. 46; I. T. 2516 (1930), C. B. IX–1, p. 268; I. T. 2533 (1930), C. B. IX–1, p. 129; Holmes Federal Taxes, 1923 Ed., p. 501; Commerce Clearing House Rewrite Service, Series of 1925, Bulletin No. 9, May 22, 1925; Holmes Federal Taxes, 6th Ed., p. 702; Montgomery Income Tax procedure, 1925, pp. 654–658.

a deliberate attempt by Congress to set the question at rest.[5] The Treasury sought legislative sanction for its regulation and practice of reducing original cost by depreciation regarded as actually sustained, Regulations 45, art. 1561,[6] or sustained and allowable, Regulations 62, art. 1561,[7] irrespective of the extent to which such depreciation had been actually used as a factor of tax computation. This, however, the Congress failed to adopt. It provided for an adjustment for prior depreciation, but expressly limited such adjustment to the depreciation ",previously allowed." [8] Cost was left undisturbed in arriving at the basis, section 204, and the adjustment was provided for in the computation of gain or loss in section 202.

We can find no justification for the view, urged by respondent, that the term " cost ", used in section 204, means depreciated cost or cost less depreciation. Since provision was explicitly made in section 202 for the depreciation adjustment in computing gain or loss, there is no ground for an inference that a similar adjustment is, by implication, to be imported into section 204. This would result in

[5] In a " critical analysis of the Revenue Act of 1924 ", published as a part of the Commerce Clearing House Unabridged Federal Tax Service, 1925, appears the following:

*Depreciation Previously Charged Must be Deducted.* Adopting the established practice of the Treasury Department, which was held to be without authority in law by the recent decision of *Ward* v. *Hopkins,* the new statute provides that in computing gain or loss proper adjustment shall be made for "any item of loss, exhaustion, wear and tear, obsolescence, amortization, or depletion, previously allowed with respect to such property," as well as for any expenditure properly chargeable to capital account. Elimination of the words "properly chargeable," which were first used, shows an intention to prevent any reduction of cost or basis on account of depreciation actually sustained which should have been charged off but for which no deduction for income tax purposes has been taken.

Commerce Clearing House Unabridged Federal Tax Service, 1925, p. 98, 1124, Note .84, is as follows:

*Losses Sustained But Charges Not Allowed.*—The legislative history of the new statute and the final adoption of the word "allowed," reflects the confusion of opinion which has heretofore been represented in the regulations and rulings, as noted below, by a most inconsistent reference to such charges as "sustained," "chargeable," "allowable," etc. It is obviously the purpose of the new statute and the new regulations to limit this adjustment of basis to such charges as have actually been recognized in the determination of income taxes, whether upon original returns or upon adjustments in final determination of tax liability, without independent examination of the propriety of such allowances.

[6] Regulations 45, ART. 1561. *Basis for determining gain or loss from sale.*—For the purpose of ascertaining the gain or loss from the sale or exchange of property, the basis is (*a*) its fair market price or value as of March 1, 1913, if acquired prior thereto, or (*b*), if acquired on or after that date, its cost or its approved inventory value. In both cases proper adjustment must be made for any depreciation or depletion sustained. * * *

[7] Regulations 62, ART. 1561. *Basis for determining gain or loss from sale.*—* * * In any case proper adjustment must be made in computing gain or loss from the exchange or sale of property for any depreciation or depletion sustained and allowable as a deduction in computing net income; the amount of depreciation previously charged off by the taxpayer shall be deemed to be the true depreciation sustained unless shown by clear and convincing evidence to be incorrect. * * *

[8] See Reports of House Committee on Ways and Means, Senate Committee on Finance, and Conference Committee, 68th Congress, on the Revenue Bill of 1924.

A full historical statement is found in Law of Federal Income Taxation, Paul and Mertens (1934). vol. 2, §18.174–18.184, incl.

the same sort of illogical computation as the Government was seeking, by the new statute, to prevent.

That there was reason for Congress to limit the adjustment to so much as had inured to the taxpayer's tax benefit and to disregard the depreciation which had had no tax effect, is apparent from *United States* v. *Ludey, supra,* in which the Supreme Court reasoned to a similar conclusion under the earlier acts.

The respondent sets forth supposititious cases to demonstrate what he regards as the absurd effect of disregarding actual depreciation of earlier years. These illustrations are, however, so commonplace that it is difficult to believe that they escaped legislative consideration. On the other hand, there is more to be said for the view that Congress recognized the diverse views and practices which had marked the history of depreciation, and sought to adopt a simple computation which would avoid the difficulties which the concept of sustained depreciation would entail. Men have not yet reached a uniform view as to the treatment of depreciation, or even of its basic postulates,[9] and it is not unreasonable to suppose that Congress was willing that the Treasury should ignore the depreciation attributable to the period before any taxing statute recognized it—1909 for corporations and 1913 for individuals. The present controversy demonstrates the legislative wisdom.

We hold, therefore, that for 1924 the computation of loss resulting from the retirement of equipment was correctly made in the deficiency notice, and that the respondent may not reduce the basis or reduce the loss by an adjustment reflecting the depreciation of $245,241.50 stipulated to have been sustained prior to January 1, 1909. This accords with the established practice of the Commissioner set forth in Sol. Mem. 4249 (1925), C. B. IV-2, p. 15, and Gen. Counsel Mem. 8573 (1930), C. B. IX-2, p. 168. The memorandum opinion of the Board in *Ann Arbor Railroad Co.,* Docket 34918, was incorrect, and we can not regard Gen. Counsel Mem. 10754 (1932), C. B. XI-2, p. 177, as well supported.

## VIII.

### HOSPITAL FUND.

FINDINGS.—The petitioners maintained hospital departments for their employees, the conduct of which was under written regulations. Each such department was maintained by monthly contributions made by the officers and employees upon a scale graduated according to their monthly pay.

---

[9] See *United Railways & Electric Co.* v. *West,* 280 U. S. 234.

* * * No employe shall have any vested right in the funds of the Department or in the property pertaining thereto, which funds and property shall belong to the Hospital Department of the Company and be devoted to the treatment of its sick and injured employes.

The Company will, at its sole expense collect and disburse all moneys contributed or otherwise made available for the maintenance of said Department. * * * The Company may from time to time at its option loan to the Hospital Fund any amount necessary to pay the current expenses of said Department in excess of its current funds but such loans shall be repaid to the Company out of contributions subsequently collected.

To these funds the companies made contributions of $63,286.73 in 1924, $61,169.77 in 1925, and $64,056.51 in 1926. The total receipts of the funds in these years, which consisted of contributions from employees and from the companies, interest on monthly balances, and miscellaneous amounts such as receipts from special services, were less than the expenditures, the deficits being $11,581.66 for 1924, $27,822.29 for 1925, and $25,143.92 for 1926. The accounts of the hospital departments were separately kept. The funds were commingled with the ordinary funds of the companies. The contributions made to the funds by the companies were charged by them to operating expenses and deducted in income tax returns. The aforesaid deficits were paid out of the surplus funds of the hospital departments accumulated in prior years. They were not deducted by the companies in their income tax returns.

OPINION.—In the respondent's determination of deficiency nothing was said as to the hospital funds. The petitioners had deducted the regular contributions of $63,286.73 for 1924, $61,169.77 for 1925, and $64,056.51 for 1926, and these deductions were not disallowed. In this proceeding, however, the petitioner raised the question as to its right to the additional deduction of the amounts of the deficits of $11,581.66 for 1924, $27,822.29 for 1925, and $25,143.92 for 1926, contending that the deficits had been likewise borne by the corporations and were therefore also deductible. The respondent challenged this and also, as new matter, claimed that the deduction of the contributions had been improperly allowed. At the trial it appeared that the deficits had been paid out of the surplus of the hospital funds accumulated in prior years, and in its reply brief the claims for the deduction of the amounts of such deficits were withdrawn. This leaves for decision only the respondent's affirmative claim that the deductions of the contributions should be disallowed.

We think that this affirmative claim of the respondent can not be sustained. It is predicated upon the views, alternatively, that the corporation owns the fund or that the contributions made by the

corporation were in any event no more than loans. We think that both these views are incorrect. The contributions were made by the corporation in the discharge of a duty, assumed by it, to provide, in part at least, for the hospitalization of its employees. The fund therefor was separately maintained under the written regulations, which constituted no less than a contract, if not an express trust. The separate accounting supports the treatment of the fund as a trust, notwithstanding the commingling of the receipts with those of the corporation. It is not true that the company is in all respects the owner of the fund, as respondent contends, for the regulations provide that the " funds and property shall belong to the Hospital Department of the Company and be devoted to the treatment of its sick and injured employes." Nor is there any evidence to support the respondent's view that the contribution made by the company is a loan. Nothing in the regulations forbids the company from making a contribution and nothing requires that every contribution shall be regarded as a loan. Certainly the provision which permits the company to " loan to the Hospital Fund any amount ", which shall be repaid, does not require that every contribution must be repaid, in the absence of evidence that it was intended as a loan. There is in this record no evidence of such intention, and it may be doubted whether any attempt by the company to recover the amount could succeed without more evidence than this record affords.

We are thus brought to the simple question whether amounts expended by the railroad in each year for the maintenance and operation of the hospitals provided for its employees are deductible as an ordinary and necessary expense of its business. We hold that they are. The deficiencies thus remain unaffected both by the petitioner's original claim for the additional deduction of the deficits and the respondent's affirmative claim for the disallowance of the deduction of the regular contributions.

### IX.

#### Amortization of Discount and Commissions on Bonds Issued Before March 1, 1913.

The facts have been stipulated and the only question presented is whether the petitioners are entitled in each taxable year to deduct the annual amortization of the discount and commissions sustained in respect of bonds issued prior to March 1, 1913. This question has been decided favorably to the petitioners in *Helvering* v. *Union Pacific Railroad Co.*, *supra*, and in accordance therewith the petitioners are entitled to the deductions claimed.

## X.

### DISPOSITION OF PREFERRED SHARES IN C.M. & ST.P. REORGANIZATION.

In 1928 the Oregon Short Line, one of the affiliated group, being the owner of preferred shares of the Chicago, Milwaukee & St. Paul Railway Co., which it had acquired before March 1, 1913, deposited them, together with cash, and received in exchange therefor a similar number of new preferred, together with mortgage bonds, of a newly organized corporation. This transaction was part of a reorganization plan, a copy of which is in evidence and the substance of which is fully set forth in *Chicago, Milwaukee & St. Paul Reorganization*, Finance Docket No. 6240, 131 I. C. C. 673. The respondent has, as a matter of law, disallowed any deduction for loss in this transaction upon the ground that the transaction was a reorganization within the definition of the Revenue Act of 1928, section 112 (i) (1), and that no loss may, therefore, be recognized, section 112 (b) (3). The petitioner, although contending that the transaction was not a statutory reorganization, primarily because the participation therein of the old corporation was not voluntary but through foreclosure (cf. *De Blois* v. *Commissioner*, 36 Fed. (2d) 11), and that the old corporation may not be regarded as a party to a reorganization, recognizes that " the question seems to be foreclosed by " *Securities Co.* v. *Commissioner*, 64 Fed. (2d) 330, and *First National Bank of Champlain, N. Y.*, 21 B. T. A. 415. The respondent's determination is sustained.

## XI.

### GAIN OR LOSS FROM SALE OF GUILD'S LAKE PROPERTIES.

FINDINGS.—In 1930 the Portland Terminal Investment Co., one of the affiliated group, sold a parcel of land containing 6.797 acres in the Guild's Lake district of Portland, Oregon, for $27,188.80. The property had been acquired in 1910 at a cost of $12,450.67. The fair market value of the property on March 1, 1913, was $17,468. Expenditures subsequent to March 1, 1913, for local assessments and platting were $1,385.36. The gain realized in the sale was $8,335.44.

In 1930 the Portland Terminal Investment Co., as a result of condemnation, conveyed to the city of Portland a parcel of land consisting of 7.973 acres in the Guild's Lake district, and received therefor $31,892. This parcel had been acquired by the Terminal Co. in 1910 at a cost of $13,931.22. Its fair market value on March 1, 1913, was $15,000. After March 1, 1913, petitioner made expenditures for local assessments and platting amounting to $951.31. The

gain realized by the petitioner in the disposition of this property in 1930 was $15,940.66.

OPINION.—The petitioner contests the respondent's determination of the fair market value of these properties on March 1, 1913. The question is purely one of fact, and evidence has been introduced on both sides by which the respective values are sought to be sustained. From a consideration of all of the evidence the foregoing findings have been derived. It is unnecessary to attempt a detailed exposition or appraisal of the evidence, but in view of the argument as to the soundness and effectiveness of the use by the respondent of a tracing superimposed upon an enlargement of a small scale map, it should be said that we do not regard this as of controlling importance in the determination of the value.

## XII.

### HERRICK CONTRACT.

FINDINGS.—Under a contract of 1923, Herrick agreed with the Oregon-Washington Railroad & Navigation Co. to construct for it a line of railroad, upon completion of which the Navigation Co. was to reimburse him for its cost. Upon Herrick's failure to perform, his claim to reimbursement should cease. Herrick spent $165,219.02 sometime before September 1926, when he failed to complete the performance of his contract obligation. Prior to this failure, the railroad company, in 1925, advanced to him $150,000. In December 1925 and September 1926 the railroad company charged $165,219.02 to its capital accounts, treating no part thereof at any time as an income tax deduction. On April 8, 1930, the railroad company transferred $15,219.02 to a suspense account.

OPINION.—The respondent included $15,219.02 in the petitioner's gross income, the theory being that the petitioner discharged an obligation of $165,219.02 by the payment of a lower sum of $150,000, and that the difference constitutes gain under the doctrine of *United States* v. *Kirby Lumber Co.*, 284 U. S. 1, and *Helvering* v. *American Chicle Co.*, 291 U. S. 426. This, we think, can not be sustained. All that happened in 1930 was the change by the petitioner of a bookkeeping entry which, so far as appears, had no substantial effect upon any obligation which the petitioner might have. If petitioner could be regarded as obligated to Herrick for the $15,219.02, it could not be said to have wiped out its obligation by its own change of bookkeeping. Furthermore, if it again be assumed that an obligation for the $15,219.02 at any time existed, it would not be a cash obligation nor one which at any time affected income as in the *Kirby* case, but rather one incurred for the nondeductible cost of a capital

investment, the reduction of which operated not to increase income, but only to reduce capital cost. That the mere reduction of a liability is not, *per se*, to be regarded as taxable income, is illustrated in *Commissioner* v. *Rail Joint Co.*, 61 Fed. (2d) 751.

Finally, it is clear from the contract in evidence that the Navigation Co. had never incurred a fixed obligation to pay the $15,219.02. Its undertaking was conditioned upon Herrick's fulfillment of his contract to construct, and hence, the condition failing, the obligation never arose. The fact that the railroad entered the full amount of $165,219.02 upon its books, in anticipation of Herrick's completion of the construction, does not serve to fix that amount as a legal obligation.

In these circumstances, we cannot regard the *Kirby* case or the *Chicle* case as controlling. The respondent erroneously included the $15,219.02 in the petitioner's income for 1930.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

SMITH, dissenting: I dissent from the conclusion reached by the Board upon the first point—"Intercompany Transportation for Investment." It seems to me that it is improper to eliminate from the gross income of the carrying company the amount which is paid to it by another company of the affiliated group for the transportation of materials used in additions and betterments. The amount received by the carrier is a part of the revenues; the amount paid therefor by the other company is a capital expenditure. These intercompany transactions do not "wash out"; hence, they should not be eliminated. In *Helvering* v. *Post & Sheldon Corporation* (C. C. A., 2d Cir.), 71 Fed. (2d) 930, the court said:

* * * But there are occasions when affiliates, despite their consolidation, must still be treated as separate entities, and indeed it is never *a priori* necessary to treat them otherwise. *Burnet* v. *Aluminum Co.*, 287 U. S. 292. One such occasion is when they cannot agree to the division between them of the single tax levied on their joint income, in which case it is to be divided "on the basis of the net income properly assignable to each." In that division, "intercompany transactions" should be included, because affiliates are always separate taxpayers, and because their corporate individuality has been preserved for some deliberate purpose. For instance, it might happen that the whole of the combined income was profits made by one affiliate in sales to another which had itself sold at cost. The first ought to bear the whole tax, and for purposes of the division the incomes would be stated without regard to affiliation.

The maintenance and operating expenses paid by the carrying company constitute "ordinary and necessary expenses" and are legal deductions from gross income under the statute. Manifestly,

the railroad performing the services can not estimate accurately the cost of such services. The figure of 7 mills per ton mile used by the Board is merely an estimate of what the cost was. That may have been far less than 7 mills per ton mile, as estimated by the officers of the petitioner. I can not believe that it was the intention of Congress that the Board should " guess " at a figure to represent such cost.