430

MAX VIAULT, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 84063, 84064, 84065, 84066, 86118, 86119, 86120, 86121.

Promulgated August 6, 1937.

[1] Proceedings of the following petitioners are consolidated herewith: Clara L. Viault; Arthur Viault; Naomah Viault; Frank Viault; Rheata M. Viault; A. J. Viault; and Gertrude Viault.

*Joseph D. Brady, Esq.*, and *N. P. Moerdyke, Esq.*, for the petitioners.

*Byron M. Coon, Esq.*, for the respondent.

STERNHAGEN: The Commissioner determined the following deficiencies in the several petitioners' income taxes:

| 1933 | | 1934 | |
|------|------|------|------|
| Max Viault | $1,821.73 | Frank Viault | $786.28 |
| Clara L. Viault | 1,824.39 | Rheata M. Viault | 628.18 |
| Arthur Viault | 1,170.71 | A. J. Viault | 676.18 |
| Naomah Viault | 1,170.72 | Gertrude Viault | 792.95 |

The four women petitioners are such only by virtue of their community interest with their husbands, and a determination as to the four husbands will reflect the proper determination as to the wives. There is no dispute as to either the evidentiary or the ultimate facts. They appear in the admitted allegations of the petitions.

The controversy grows out of a contract made on February 12, 1933, between Max and Arthur Viault, on the one hand, called the sellers, and Frank and A. J. Viault, on the other hand, called the buyers. A copy is appended to the petition. It is too long to set forth here verbatim; and, since the present litigation turns largely upon its proper construction, it can not be satisfactorily paraphrased in findings. The four brothers were the shareholders in the California Milling Corporation, Frank and A. J. owning the majority and Max and Arthur the minority. There had been increasing disagreement among them as to the management of the corporation and the conduct of its business, until finally they executed the contract to bring about the acquisition of all the shares by the buyers and the consequent withdrawal by the sellers from the corporation and the business. There is no disagreement among them as to the meaning or effect of the contract. They have, so far as this record shows, been in harmony under it; and, since the contract has now been completely performed, there is no longer any occasion for internal dispute. The Government, however, in determining their several taxable incomes, has made its own construction of the contract, which all the petitioners now contest.

1. In filing their income tax returns, none of the petitioners computed his income upon the installment basis recognized by section 44 of the Revenue Act of 1932. They did not request permission from the Commissioner to use such basis, and in this proceeding they disclaim the privilege of using it and of any election to use it. The Commissioner, however, used the installment basis in computing the tax and the resulting deficiency. He does not now, however, make any defense of this use. The installment basis has always been

regarded as a permissive basis available to the taxpayer at his election if he was qualified under the statute to use it. Indeed, the taxpayer's election has been regarded as so important that it is only under rare circumstances that the election, once exercised, has failed to bind him. *Kaplan* v. *United States*, 18 Fed. Supp. 965; *Charles J. Derbes*, 24 B. T. A. 276; affd., 69 Fed. (2d) 788; certiorari denied, 293 U. S. 580. The Commissioner was clearly in error in imposing upon the taxpayers the use of the installment basis as the method for determining the tax.

2. The corporation had outstanding both common and preferred shares and the contract provided a complicated method whereby over a period of years the sellers should divest themselves of all their holdings in both classes of shares and the buyers should acquire them. The Commissioner treated the contract as a present installment sale, and argues that in this view the transaction was consummated in 1933, when the contract was made. In this construction of the contract the Commissioner was likewise clearly in error. The contract was not a contract of sale whereby title to all of the shares passed at once to the buyers, but was an executory contract which expressly provided that the sale should not be complete as to any of the shares, or title pass until all of the obligations as to all of the shares had been fulfilled. It was expressly provided that the contract was unitary and not divisible, and that none of its provisions setting up different methods and terms of payment for different classes of shares should be construed as a separate sale of less than all the shares.

As a whole, the sellers were, by a complicated method, to receive $607,500 for their 3,375 preferred and 4,500 common shares, all of which had been held by them for over two years. For convenience of computation, but not "as a separate purchase price for such preferred shares", $337,500 out of the total $607,500 was assigned as applicable to the preferred shares. One hundred and thirty-four thousand dollars was to be paid on June 1, 1933, and the remainder was to be paid in installments on each June 1 thereafter. The buyers were permitted, at their election, to cause the corporation from time to time to retire some of the preferred shares owned by the sellers, in which event the amount received by the sellers from the corporation in such retirement would serve pro tanto in lieu of payment under the contract. On June 1, 1933, $134,000 was paid by the corporation to the sellers, of which Max received $89,300 and Arthur $44,700, in consideration for which they surrendered to the corporation respectively 893 and 447 preferred shares, which were then retired. On August 31, 1933, the corporation paid a preferred dividend of $1.75 a share, of which the proper proportionate amount

went to Max, who then owned 1,357 preferred shares, and Arthur, who owned 678.

The Commissioner, erroneously using the installment basis, treated the amounts received by the sellers in retirement of their preferred shares as if they had been received from the buyers as an installment upon the purchase price, and he treated the August 31 dividend received as if it were "interest" paid by the buyers upon an indebtedness for the unpaid principal of the purchase price. There is no reason for such treatment. The amounts were in both instances received from the corporation itself by the sellers as shareholders, and the fact that by the contract such distributions by the corporation affected the buyers' contractual obligation, did not convert the character of such distributions into payments by the buyers. True it is that because of such corporate distributions the buyers were to pay less to the sellers than they otherwise would, but it is better to say that thereby the purchase price was reduced than to distort the distribution by the corporation.

The distribution in retirement of part of the outstanding preferred shares is clearly and adequately covered for tax purposes by the revenue act. It is a distribution in partial liquidation and is therefore to be treated as in payment for the surrendered shares (sec. 115 (c)), the gain therefrom to be computed as the difference between cost and amount received (sec. 111). These amounts are in the record undisputed, from which it appears that upon Max's 893 shares he had a cost basis of $36,004.51 and received $89,300, thus realizing gain of $53,295.49, and upon Arthur's 447 shares the basis was $14,058.15 and the amount received $44,700, thus resulting in a gain of $30,641.85. It happens that these figures closely approximate those used by the Commissioner in his calculation upon the installment basis, but the similarity is entirely adventitious.

The dividend of $1.75 a share on preferred, paid by the corporation on August 31, 1933, was treated by the Commissioner as "interest" paid to the sellers by the buyers upon the unpaid principal of the contract purchase price for common shares. This too is an unwarranted distortion of the character and source of the receipt. There is no provision in the contract whereby preferred dividends would be a factor in the computation of the "interest" which the buyers undertook to pay, and therefore the Commissioner's characterization of the amount as "interest" is not even supported by the contract. But if it were, under the contract, to serve the purpose of reducing interest, it would still, for all other purposes, retain its character as a distribution by the corporation to its shareholders in the form of a dividend; and the fact that by the contract the parties might have adjusted the purchase price by calling an amount "in-

terest," would not be sufficient to give it that character under the revenue act, *Baltimore & Ohio Railroad Co.* v. *Commissioner*, 78 Fed. (2d) 460. Properly the amount thus received by the sellers is included within their income as dividends received from a domestic corporation, and the treatment otherwise by the Commissioner is in error.

Of the total amount of this dividend, the corporation, acting in accordance with section 213 of the National Industrial Recovery Act (Act of June 16, 1933, 48 Stat. 195, ch. 90), deducted and withheld 5 percent of the amount of the dividend, representing the N. I. R. A. excise tax. The Commissioner, treating the entire amount of the dividend as interest received from the buyers, made no allowance for a deduction of the 5 percent excise tax withheld. Since the Commissioner, by his own ruling, T. D. 4372, XII–2 C. B. 387, 393, recognizes that the 5 percent tax is properly to be allowed as a deduction, consistently with the requirement that the entire dividend shall be included in gross income, it may be assumed that the Commissioner would have allowed such a deduction if he had correctly recognized the dividend in its true character instead of treating it as interest. The withheld tax is a proper deduction and should be so treated in the recomputation.

The contract provided that of the total price of $607,500 the remaining $270,000 was related to the common, although not to be regarded as a separate purchase price for the common. This amount was to be paid, $66,000 on June 1, 1933, and in installments on each June 1 thereafter, according to a prescribed calculation. As fast as the sellers received payments they were to deposit common shares pro rata in escrow, title, however, to remain in them until all the payments were complete, although payments when made became irrevocably theirs. "Interest" was provided to be paid by the buyers upon the outstanding balance. All dividends paid on common to the seller shareholders were to operate as if in discharge of the purchase price and the "interest", in a prescribed order.

On June 1, 1933, the buyers made the initial payment of $66,000 to the sellers, and in accordance with the contract the sellers thereupon deposited the pro rata number (1,100) of common shares, as prescribed. The Commissioner, erroneously using the installment basis, treated this, as he had the initial payment with reference to preferred, as including the proportionate gain upon the assumed entire sale. The petitioners assail this, not only for the reasons already considered in respect of the preferred, but also because no present sale occurred. Although the Commissioner was clearly in error in his method of computing the gain, there is, on the other hand, no merit in the petitioners' demand that the entire amount is without gain and free from tax in 1933. It is not necessary in such

a situation that title should pass or that the sale be otherwise complete before the seller may be taxed upon the gain realized within the taxable year. The tax is imposed not upon the sale nor upon the occasion of the transfer by the owner of the property sold. It is a tax upon income and is therefore primarily to be measured with regard to the gain derived by the taxpayer, to the extent that such gain can with reasonable certainty be ascertained within the taxable year. The sellers, in 1933, received $66,000 as part of the total consideration for all their shares, and although title to the shares was withheld by the sellers, there is a reasonable method, consistently with the contract and the revenue act, for determining how much gain is included within the amount received in each taxable year. When payments were received by the sellers, such payments were in no event qualified or returnable. Even in the remote possibility that the buyers should fail to take and pay for all the shares and thus enable the sellers to cancel the contract and retain the shares, they still were permitted to keep the payments which had been made. Under such circumstances it is clearly proper to treat the amount received in each taxable year as including gain. In *Birdneck Realty Corporation*, 25 B. T. A. 1084, where, as here, the sale was not technically consummated in the year when partial payments of the purchase price were made, the Board said:

* * * the question whether the transactions were sales is not determinative of income under these contracts. During the taxable period petitioner received under its contracts cash sums over which it acquired absolute ownership and control. While its obligation to transfer title in the lot was dependent upon payment of all installments of the purchase price, its right to the cash installments as paid was absolute and unconditional. They were not held in trust nor subject to any obligation to return in case the contractural obligations were not fulfilled. Under the statutory definition of gross income in section 213 (a), they clearly constituted income derived from dealings in property. * * *

See also *Commissioner* v. *Swift*, 54 Fed. (2d) 746; *Helvering* v. *Nibley-Mimnaugh Lumber Co.*, 70 Fed. (2d) 843; *Commissioner* v. *Union Pacific R. R. Co.*, 86 Fed. (2d) 637; and *Union Pacific Railroad Co.*, 32 B. T. A. 383, 390.

Because of the complicated method of payment to the sellers, it is difficult to compute how much of each annual amount of purchase price received properly represents gain. For each amount received from the buyers, the sellers were to deposit pro rata a number of their common shares in escrow, pending the full performance of the contract. Moreover shares were likewise to be deposited in escrow in the same proportion to amounts received as dividends from the corporation. Title to such shares while in escrow continued to remain with the sellers. See *Roscoe H. Aldrich*, 3 B. T. A. 911, 919; *Charles M. Thorp, Jr.*, 32 B. T. A. 767; *Grand Rapids Trust Co. et*

*al., Executors*, 34 B. T. A. 170. After the full purchase price had thus been received by the sellers, the shares in escrow would then belong and be deliverable to the buyers, those alike which had been deposited because of amounts received from the corporation and those which had been deposited when payments had been made by the buyers. If the Commissioner had not used the installment method, but had adopted an approved theory, perhaps a computation under such theory resulting in a reasonable determination of gain would, by virtue of the respect to be given to his determination, have been sustained, but, in the present state of the record, a proper method of computation is at large and must be determined by the Board. In the tax year 1933 the sellers received, in their proper proportions, $66,000 as part purchase price upon all their shares. In this year they deposited in escrow 1,267 shares, 1,100 being deposited when the initial $66,000 was received and 167 when the common dividend of June 10, 1933, was received. Of these 1,267 shares, Max deposited 844 shares, the cost basis of which to him was $20,-417.31, and Arthur deposited 423 shares, the cost basis of which to him was $7,982.01. Since the amounts received from the corporation must be treated as dividends, they may not be included in the computation of gain even although common shares were deposited when the dividends were received. The correct method seems to be to regard the $66,000 as including gain upon the entire number (1,267) of common shares which were deposited in escrow in the year 1933. Since Max received $43,980 of this amount and deposited in escrow 844 shares having a basis of $20,417.31, his gain is $23,-562.69. Arthur, by the same method, should properly be regarded as realizing a gain of $14,037.99 upon his receipt of $20,020 and deposit in escrow of shares having a basis of $7,982.01.

On June 10, 1933, the corporation declared and paid a common dividend of $5 a share, Max thereby receiving $15,000 on his 3,000 shares, and Arthur $7,500 on his 1,500 shares. In accounting under the contract, these dividends served, as between the contracting parties, to reduce both the principal amount of purchase price payable by the buyers and the "interest" which thereafter would have otherwise become due. To the extent that this dividend was accounted for as applicable to the principal purchase price, the sellers deposited a ratable number (167) of common shares in escrow. The Commissioner treated these dividends as if they had in fact been received from the buyers in part as installments of the total purchase price and in part as "interest". In this he was likewise in error. The amount received by petitioners was a dividend by the corporation, payable to them only because they were shareholders, and its character as such under the revenue act is immutable and must be recognized by the Government as well as by the shareholders.

3. In 1934 the corporation paid dividends on both its outstanding preferred and its outstanding common, and these distributions were made in proper proportions to Max and Arthur, according to the number of shares which they owned. The Commissioner treated these dividends which had been received by Max and Arthur from the corporation as if they had been received by Frank and A. J., the buyers, and used by them in the purchase of shares and the discharge of "interest" obligations. The petitioners, Frank and A. J., of course contest these inclusions in their income as common and preferred dividends, and in this they are correct. The rationale of the discussion in respect of the dividends for 1933 is entirely applicable here, and it results that the respondent's determination as to the buyers for 1934 was in error and can not be sustained. The amounts distributed by the corporation on shares held by Max and Arthur are properly within their several incomes for 1934 as dividends. They should be excluded from the incomes of Frank and A. J. and, consistently with this, the interest deductions of Frank and A. J. which the Commissioner erroneously allowed should be properly adjusted.

*Judgments will be entered under Rule 50.*