## COMMISSIONER OF INTERNAL REVE-NUE v. TYNG.

### SAME v. BUCHSBAUM.

#### Nos. 17–19.

Circuit Court of Appeals, Second Circuit.
Aug. 3, 1939.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Carlton Fox, Sp. Assts. to Atty. Gen., for petitioner and cross-respondent Commissioner of Internal Revenue.

Wayne Johnson, of New York City, for respondent and cross-petitioner Lucien Tyng.

J. R. Sherrod, of Washington, D. C., and C. E. Paxson, of New York City (Miller & Chevalier and Robert M. Weston, all of New York City, of counsel), for respondent and cross-petitioner William Buchsbaum.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Both the Commissioner of Internal Revenue and the taxpayers Tyng and Buchsbaum appeal from orders of the

Board of Tax Appeals redetermining the income of the taxpayers for 1929.

Two questions are involved in the appeals. The first is whether the transaction about to be described was a "reorganization" within Section 112 (i) (1) of the Revenue Act of 1928, 26 U.S.C.A. § 112 note. If it was such a "reorganization" (and that it was one the Board found), then by virtue of Section 112 (b) (3) and (c) (1), 26 U.S.C.A. § 112(b) (3), and (c) (1), no gain should be recognized upon the property received in exchange other than the cash.

Subdivision (i) (1) of Section 112 defines reorganization thus:

"(i) *Definition of Reorganization.* As used in this section and sections 113 and 115—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected."

The other provisions of Section 112 which are relevant read as follows:

"(b) *Exchanges solely in kind—* * *

"(3) *Stock for stock on reorganization.* No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\* \* \* \* \* \*

"(c) *Gain from exchanges not solely in kind—*

"(1) If an exchange would be within the provisions of subsection (b) * * * (3) * * * of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but

also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

W. S. Barstow & Co. of Delaware (hereinafter referred to as Barstow & Co.) owned about 55½% of the voting stock of General Gas & Electric Corporation. Barstow Securities Corporation of Delaware (hereinafter called Securities) owned 94,005 shares of the common stock of Barstow & Co. that was issued and outstanding, William Buchsbaum owned 1,800 shares, and others the remaining 9,960 shares. There were also 6,981 shares of preferred stock of Barstow & Co.

Of the stock of Securities outstanding the taxpayers Tyng and Buchsbaum owned 21,665 and 7,540 shares respectively and their associates owned the remainder. The Associated Gas & Electric Co. (hereinafter called Associated) sought control of General Gas & Electric Corporation and finally gained it by buying up stock control of Securities and Barstow & Co.

On February 5, 1929, the owners of the stock of Securities and of Barstow & Co. signed a contract for the sale of their stock to Associated Gas & Electric Company for the sum of $50,000,000 in cash, but three of the twenty-three stockholders of Securities, namely, Tyng, Buchsbaum and W. S. Barstow signed the contract subject to an oral agreement simultaneously entered into that the written contract should be modified by providing for payment of part of the consideration, to be furnished by Associated, in obligations of the latter, rather than wholly in cash. One of the reasons for demanding that the payment be made in part in such obligations was the desire of the three stockholders to lessen their income taxes, and they advised one Daly, who represented Associated in the negotiations, that the transaction would not be made on a cash basis.

On February 11, 1929, an agreement was made, supplementary to that of February 5, by the terms of which the transferors could, in payment for their stock, demand certain obligations of Associated for all or any part of the purchase price above the $10,000,000 cash already deposited by it in escrow.

Under this agreement the transferors elected to receive and actually were paid

cash in the sum of $34,699,528.54 and the following securities in Associated valued at $15,208,021.60:

| | |
|---|---|
| 4½% convertible gold debentures, dated January 15, 1929, due January 15, 1949, face value $11,776,000 at 93 | $10,951,680.00 |
| Accrued interest | 138,368.00 |
| Gold debenture bonds, consolidated refunding 5% series, dated October 1, 1928, due October 1, 1968, face value $4,255,000 at 90 | 3,829,500.00 |
| Accrued interest | 117,012.50 |
| 5½% convertible investment certificates, due November 15, 1938, face value $175,000 at 97 | 169,750.00 |
| Accrued interest | 1,711.10 |
| | $15,208,021.60 |

The agreement of February 11 also provided for the purchase by Associated of preferred stock of Barstow & Co.

The taxpayer Tyng received the following (exclusive of his share of the interest accrued upon the initial deposit of $10,000,000):

| | |
|---|---|
| Cash | $ 4,233,231.97 |
| 4½% convertible debentures at 93 | 3,092,250.00 |
| Accrued interest thereon | 39,068.75 |
| Gold debenture bonds, consolidated refunding 5% series, at 90 | 2,790,000.00 |
| Accrued interest thereon | 85,250.00 |
| Total | $10,239,800.72 |

The taxpayer Buchsbaum received the following (exclusive of his share of the interest accrued upon the initial deposit made by Associated of $10,000,000):

| | |
|---|---|
| Cash | $1,285,613.15 |
| 4½% convertible debentures at 93 | 3,093,180.00 |
| Accrued interest thereon | 39,080.50 |
| Gold debenture bonds, consolidated refunding 5% series at 90 | ...... |
| Accrued interest thereon | ...... |
| Total | $4,417,873.65 |

The Commissioner held that the transaction was a sale, and not a reorganization, within the meaning of Section 112 (i) (1), 26 U.S.C.A. § 112 note. He, therefore, included the value of the obligations of Associated received by the taxpayers in their gross income for 1929 and, as a result of this and other adjustments, determined certain tax deficiencies.

The Board of Tax Appeals held that the transaction involved a reorganization within the meaning of Section 112 (i) (1) and reduced the deficiencies accordingly.

The Commissioner contends that the Board was in error in holding that the purchase by Associated of substantially all the outstanding stock of Securities and Barstow & Co. in consideration for the payment of $34,699,528.54 in cash, and of $15,208,021.60 (including interest) in its unsecured "Convertible Gold Debentures", "Gold Debenture Bonds" and "Convertible Investment Certificates" constituted a "reorganization" within the meaning of Section 112 (i) (1).

■ We think the Board was right in holding that the transaction was a reorganization rather than a sale.

In Cortland Specialty Co. v. Commissioner, 2 Cir., 60 F.2d 937, we held that the transfer of substantially all of the properties of one corporation to another corporation in exchange for cash and notes (payable within a few months) was not a "reorganization" within the meaning of the income tax statute because there was no continuity of interest on the part of the transferor.

In Worcester Salt Co. v. Commissioner, 2 Cir., 75 F.2d 251, we held that a transfer of all the assets of Kerr-Remington Salt Co. to Worcester Salt Co. in exchange for $680,000 in bonds of the latter was not a reorganization because the bonds did not preserve "continuity of interest" which "is a requisite". The bonds there involved were apparently five year bonds.

In Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428, the Supreme Court held that a transfer of property for a consideration of cash and promissory notes payable within less than a year was not a "reorganization".

It may be argued that under the foregoing decisions a transaction like the one before us was not a reorganization within the meaning of the statute, yet in each

case the securities given in exchange were short term obligations involving no substantial continuity of interest on the part of the transferors. Here the bonds were payable in twenty and forty years respectively.

In Helvering v. Watts, 296 U.S. 387, 56 S.Ct. 275, 276, 80 L.Ed. 289, stockholders owning all the shares of Corporation A exchanged their holdings for stock in Corporation B and for mortgage bonds of Corporation A guaranteed by Corporation B. The Supreme Court held that the exchange was a "reorganization" and that no taxable gain was recognizable in respect to the bonds received in exchange. Justice McReynolds said: "The bonds, we think, were securities within the definition, and cannot be regarded as cash, as were the short-term notes referred to in Pinellas Ice Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428."

■ The Commissioner argues that while secured bonds may preserve a continuity of ownership, unsecured bonds do not, and are not "securities" within the meaning of Section 112 (b) (3), 26 U.S.C.A. § 112 (b) (3). The distinction does not seem to us a reasonable one. Unsecured bondholders are more substantially subjected to the risk of the business than mortgage bondholders. The latter can look to the mortgage property while the former, like stockholders, have a continuing interest in all the property transferred. Cf. Nelson Co. v. Helvering, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 821. We think the proper test as to whether bonds come within the meaning of "securities" under Section 112 (b) (3) is not whether they are secured or unsecured, but whether they represent a long or short term investment on the part of the transferor.

Five different Circuit Courts of Appeal, besides our own, and the Court of Claims as well, have decided that the receipt of "securities" results in the retention of a continuity of interest necessary for a reorganization. We reached this conclusion in Watts v. Commissioner, 2 Cir., 75 F.2d 981, afterwards affirmed by the Supreme Court sub nomine Helvering v. Watts, supra. The following decisions are to the same effect: Scofield v. LeTulle, 5 Cir., 103 F.2d 20, 22; Commissioner v. Freund, 3 Cir., 98 F.2d 201, 205; Commissioner v. Newberry L. & C. Co., 6 Cir., 94 F.2d 447, 449; Commissioner v. Kitselman, 7 Cir., 89 F.2d 458, 460; Burnham v. Commissioner, 7 Cir., 86 F.2d 776, certiorari denied 300 U.S. 683, 57 S.Ct. 753, 81 L.Ed. 886; Lilienthal v. Commissioner, 9 Cir., 80 F.2d 411, 413; White v. United States, Ct.Cl., 22 F.Supp. 821, 829.

For the above reasons we affirm the Board in its conclusion that the transaction in question was a "reorganization" and that no taxable gain was derived by Tyng or Buchsbaum as a result of the securities of Associated acquired by them in exchange for the stock which they transferred to the latter.

The second question is raised on the appeals by the taxpayers. They contend that the gain resulting to them from the exchange of their stock for the cash paid by Associated in 1929 should be taxed at 12½ per cent under Section 101 (a) of the Revenue Act of 1928, 26 U.S.C.A. § 101 note. They are only entitled to this special rate if the gain was realized from the exchange or sale of property which was held by them for more than two years. Section 101 (c) (8), 26 U.S.C.A. § 101 note.

Tyng contends that 6,665 of the 21,665 shares of Securities which he sold to Associated in 1929 had been held by him for more than two years prior to 1929. Buchsbaum makes the same claim as to 7,540 shares of Securities sold by him to Associated in 1929. The 6,665 and 7,540 shares were received under a contract made December 13, 1927, which was less than two years before the time of sale.

For determining the period for which a taxpayer has held property received in an exchange Section 101 (c) (8) (A), 26 U.S.C.A. § 101 note, provides that: "there shall be included the period for which he held the property exchanged, if under the provisions of section 113, the property received has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged."

To make up the two years during which the taxpayers must have held the property transferred in order to avail themselves of the 12½ per cent rate, they seek to tack an earlier period to the one intervening between December 13, 1927, and the transfer in 1929. To do this they invoke an earlier contract of October 9, 1925, whereby they claim to have acquired shares for which the later ones sold to Associated were obtained through a tax-free reorganization.

By the contract of October 9, 1925, W. S. Barstow, who owned the entire capital stock of 14,400 shares of the Barstow Securities Company of New York (herein called Securities of New York) agreed to sell 7,350 shares of such stock to five of his business associates, among whom were the taxpayers, and the five associates bound themselves jointly and severally to purchase the aforesaid stock. On the same day W. S. Barstow endorsed a certificate for 14,400 shares in blank and delivered it to an agent in escrow subject to the terms of the agreement. W. S. Barstow was to remain entitled to vote the stock and to receive ordinary (but not extraordinary or liquidating) dividends while the shares remained on deposit. The associates were not to assign or otherwise dispose of their interest in any of the stock except to employees of one of the Barstow enterprises, and this restriction was to be made binding on all such assignees. The associates also had the option to purchase the remaining 7,050 shares from Barstow's Estate upon his death if they were not then in default under the contract.

As consideration for the stock the five associates were to pay W. S. Barstow $600,000 in fifteen semi-annual instalments of $40,000 each. The depository was to release the 7,350 shares of stock to the associates as follows: On August 1, 1933, six months after the due date of the last instalment, it was to deliver certificates for 7,190 shares provided the instalment payments had been made. If at that time Barstow so directed, or if he should then be deceased, the depositary was also to deliver certificates for 160 additional shares making up the total of 7,350 shares which had been sold.

By an agreement dated January 25, 1926, the five associates, pursuant to understanding reached in the contract of October 9, 1925, agreed upon their respective interests in the 7,350 shares which had not previously been allocated.

On December 8, 1927, as a result of certain discussions between the associates and W. S. Barstow, the Barstow Securities Corporation of Delaware (herein called Securities) was organized with an authorized capital of 100,000 shares. The associates had become dissatisfied with the arrangements made on October 9, 1925, and desired, especially, to terminate the joint liability imposed by that agreement. On December 13, 1927, the associates entered into individual agreements with W. S. Barstow superseding the contract of October 9, 1925. The later agreements recited that payments had been made under the contract of October 9, 1925, and that the purchaser agreed to pay for shares in Securities (of Delaware) the balance of the purchase price in eleven semi-annual instalments. On the same day, with the consent of the associates, the 14,400 shares of Securities of New York were exchanged for 79,005 shares of the common stock of Securities (of Delaware). The remaining authorized 5,995 shares of Securities (of Delaware) were never issued. Securities of New York was then dissolved and its assets, consisting of stock in Barstow & Co. (of Delaware), were distributed to its sole stockholder, Securities (of Delaware). The shares of Securities (of Delaware) that were received by each of the taxpayers under the agreements of December 13, 1927, gave them substantially the same proportionate stock interest in that company as they had previously had under the contract of October 9, 1925, in Securities of New York. Slight adjustments in the proportionate interest were necessitated by previous sales to certain employees. The stock of Securities (of Delaware) was placed in a voting trust, the certificates of which were to be delivered to Barstow as security for the balance due on the stock. It is these shares which were the subject of the exchange with Associated involved in the first point decided in this opinion.

The question for determination is whether this transaction under which the taxpayers received stock in Securities of Delaware and gave up an interest in stock of Securities of New York comes within the provisions of § 113 (a) (6), 26 U.S. C.A. § 113 note, and § 112 (b) (3), 26 U.S.C.A. § 112 (b) (3). Section 113 (a) (6), 26 U.S.C.A. § 113 note, provides that "if the property was acquired upon an exchange described in section 112 (b) to (e), inclusive, the basis shall be the same as in the case of the property exchanged. * * *" Section 112 (b) (3) provides: "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are * * * exchanged solely for stock or securities * * * in another corporation a party to the reorganization."

 We have no difficulty in finding that the release on December 13, 1927, of the rights and obligations under the contract of October 9, 1925, was pursuant to an agreement to make the exchange with Securities (of Delaware) and that W. S. Barstow, who carried out the exchange, was acting for the other parties to the contract of October 9, 1925. Accordingly, we think the several steps should be treated as part of a single transaction with the same effect as though each taxpayer had personally exchanged his interest in the contract of October 9, 1925 for stock of Securities (of Delaware). The argument of the Commissioner that the parties voluntarily cancelled the 1925 contract and that the exchange on December 13, 1927, was made by Barstow alone seems to us to contradict the reasonable inferences to be drawn from the facts.

 In our opinion the transaction of December 13, 1927, should be regarded as within the provisions of § 112 (b) (3), 26 U.S.C.A. § 112 (b) (3). There clearly was a reorganization within the meaning of § 112 (i) (1), 26 U.S.C.A. § 112 note, and we think that the interest which the taxpayers had under the contract of October 9, 1925, is included within the phrase "stock or securities" as used in § 112 (b) (3).

We think that when the associates agreed to purchase stock of Securities of New York and Barstow delivered the certificate endorsed in blank to an escrow agent that the title to the shares passed. To be sure voting rights and the right to ordinary dividends were retained by Barstow. So far as the dividends are concerned they were very likely retained by him instead of charging interest upon the unpaid purchase price. The voting rights were retained in order to insure a continuity of management policy in companies in which he still owned almost a 50% interest. But the risk of the shares decreasing in value was to be borne wholly by the purchasers. The careful provisions that Barstow was not to receive any liquidating or extraordinary dividends further supports the argument that the purchasers had become the owners of the corpus.

 When the purchasers agreed in January, 1926, as to the allocation of their interests between themselves, the taxpayers became vested with definite undivided rights in the stock. If it be said that a single co-obligor could not obtain his stock without paying the entire balance due under the contract this did not affect his title but only left him in a position where he would have to pay a larger amount than his pro rata share and look to his joint obligors for reimbursement. We see little distinction legally between this case and a speculator who has his stock pledged to his broker. We think that the provisions of the statute covering capital gains ought not to be construed so narrowly as to exclude the interests of persons whose stocks are held in common subject to a pledge.

In our opinion the Board was wrong in holding that the 12½% capital gains rate should not be applied to the gains arising out of the exchange with Associated in 1929.

The orders appealed from should be modified in accordance with this opinion and the proceedings should be remanded for recomputation of the taxes.