TED F. MERRILL AND ELIZABETH H. MERRILL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 92071. Filed April 19, 1963

*Willard D. Horwich*, for the petitioners.
*Allan I. Blau* and *Robert L. Gnaizda*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the taxable year 1956 in the amount of $9,215.14. The only issue remaining for decision is whether a joint venture

to which petitioner Ted F. Merrill was a party held certain property for more than 6 months so that his profit from its sale is taxable as long-term gain under section 1231 of the Internal Revenue Code of 1954.[1]

FINDINGS OF FACT

Petitioners Ted F. Merrill and Elizabeth H. Merrill were at all times material hereto husband and wife and residents of Los Angeles, Calif. They filed a joint income tax return for the calendar year 1956 with the district director of internal revenue, Los Angeles, Calif. Elizabeth H. Merrill is involved herein only because she filed a joint income tax return with her husband.

Sometime in December 1955 or January 1956, Alonzo Petteys[2] brought to Merrill's attention, with the suggestion that it might be purchased for a reasonable price, certain property, consisting of land and a three-story grain elevator with warehouse and office space attached, located at 1498 East Fourth Street, Los Angeles, Calif. (hereafter referred to as the property). Merrill examined the property and sometime thereafter entered into a joint venture with Petteys and Elmore Snary (hereafter referred to as the joint venture) for the purpose of purchasing it.

When the property was first brought to Merrill's attention it was owned by the Sunset Milling and Grain Co. (hereafter referred to as Sunset). Sometime in December 1955 or early January 1956, Merrill, in a telephone conversation with an executive of Sunset, made an offer to purchase the property in behalf of either the joint venture or the Merrill Investment Co., Inc., which Merrill and Snary discussed but never formed.

The Underwriters Salvage Co. paid Merrill $4,009.50 for the use of the property as a storage area during the period February 15, 1956, to July 1, 1956. The individual who acted for Underwriters Salvage Co. in this transaction dealt solely with Merrill and he made no investigation as to what interest Merrill had in the property. The $4,009.50 was accounted for in the gross receipts of the joint venture.

On April 27, 1956, a meeting of the board of directors of Sunset was held at which time the following took place:

(a) The board was presented with an offer by Merrill and Snary on behalf of the joint venture to purchase the property upon the terms and conditions set forth in escrow instructions dated April 20, 1956. These escrow instructions were on a form provided by Southwest Escrow Corp. (hereafter referred to as Southwest) and were signed by petitioner and Snary.

[1] All statutory references will be to the Internal Revenue Code of 1954.
[2] All individuals will be referred to after the first reference by their surnames.

(b) The board of directors authorized the acceptance of the above offer of Merrill and Snary on behalf of the joint venture.

The actions of the board of directors were confirmed and ratified by the shareholders of Sunset at a meeting held later the same day. After the meeting of the shareholders, the escrow instructions dated April 20, 1956, were signed by the appropriate officers of Sunset and thereupon mailed to Southwest.

The pertinent terms of the escrow instructions dated April 20, 1956, were as follows:

(a) Purchase price: $125,000.

(b) Terms of payment: $25,000 downpayment into escrow, balance of $100,000 payable $3,000 monthly commencing 30 days after close of escrow with the balance being secured by a note and deed of trust in favor of Sunset.

(c) Escrow was to close on or before May 20, 1956.

(d) Oil, gas, and other minerals, and rights thereto, were retained by Sunset without right of entry to the surface of the land.

(e) Buyers were required to secure fire and extended coverage insurance of at least $100,000.

(f) Property taxes and interest were to be prorated as of the close of escrow.

(g) The escrow company, on behalf of Sunset, was to secure from Title Insurance & Trust Co. a standard policy of title insurance in favor of buyers in the amount of $125,000 showing title free and clear of all liens except current property taxes and the $100,000 deed of trust referred to in provision (b) above.

On or before May 9, 1956, all the terms and conditions of the above escrow instructions were complied with by Sunset and the joint venture, and a grant deed to the property executed and dated April 27, 1956, was recorded in the names of Snary and Merrill on May 9, 1956. At the same time the deed of trust required by the escrow instructions was also recorded. The grant deed to the property in the name of Merrill and Snary was delivered to them on May 9, 1956. Title was vested in the names of Merrill and Snary acting on behalf of the joint venture.

Colorado Milling and Elevator Co., a Colorado corporation (hereafter referred to as Colorado), succeeded to the interests of Sunset in the latter part of May 1956.

Fred Wallace, Ebenezer Wallace, Jr., Harriet Eleanore Journigan, and Muriel Edith Wallace (hereafter sometimes referred to as the Wallace group) were at all times material the sole stockholders and principal officers of the Southern California Stationers Co. (hereafter referred to as Stationers), a California corporation engaged in the retail sale of stationery, office supplies, shelving, and office equipment.

As of January 1, 1956, the Wallace group were the owners of real property located at 646–648 Venice Boulevard, Los Angeles, Calif. (hereafter referred to as the Venice property). Stationers leased the Venice property from the Wallace group and conducted its business thereon.

During the early part of 1956, the Wallace group learned that the State of California was intending to condemn the Venice property and in May 1956 they received formal notification from the State of California of the State's intention to condemn. The Wallace group ultimately received $250,000 from the State of California for the Venice property in December 1956.

On or about April 16, 1956, the Wallace group entered into an option agreement with the joint venture which granted the Wallace group a 90-day option to purchase the property. The consideration for the option was the amount of $25,000, which the option recited would be applied against the purchase price if the option were exercised. The terms of the option required the purchase price of $250,000 to be paid: $25,000 with the execution of the option, $175,000 payable on the close of escrow, and the balance of $50,000 payable at the rate of $4,000 a month including interest at 5 percent, secured by a deed of trust on the property. If the option was exercised, a 30-day escrow was to be opened with Southwest and taxes and insurances would be prorated as of the close of escrow. The usual escrow fees were to be divided equally between the buyers and sellers, and the joint venture was to provide the buyers with a policy of title insurance showing the property to be free and clear, except for the current property taxes and the $50,000 deed of trust. The joint venture agreed to give possession of the property to the Wallace group on a 5-day notice after the opening of the escrow upon the payment of an additional $25,000 which would be applied to the purchase price.

The option agreement also provided that if the option was exercised, the joint venture at its expense would make specified repairs to the building and deliver possession of the premises hose cleaned. The final provision of the option agreement was that the joint venture would warrant and represent that the premises were free and clear of all encumbrances against the same except property taxes, and that title thereto was in a marketable condition.

The $25,000 payment required under the option agreement as consideration for the option was paid directly to the joint venture on or about April 16, 1956, at the time the option was executed. On June 20, 1956, the option was formally exercised by the Wallace group and notice to that effect was transmitted to the joint venture by a letter to Merrill signed by Fred Wallace dated July 2, 1956. A postscript to this letter indicated a willingness on the part of the buyers to extend the escrow for 120 days, with buyers nevertheless assuming taxes and insurance on date of possession.

On July 5, 1956, an escrow was opened with Southwest with respect to the property and escrow instructions, dated July 5, 1956, were prepared and signed by Merrill and Snary, on behalf of the joint venture, and by the Wallace group.

The pertinent terms of the July 5, 1956, escrow instructions were:

(1) The escrow was to close on or before November 12, 1956.

(2) Of the total purchase price of $250,000, $50,000 was payable outside of escrow (directly to the joint venture), $50,000 was to be paid into escrow on or before August 16, 1956, $100,000 was payable into escrow on or before the closing date, and $50,000 with interest thereon at 5 percent was to be paid in installments of $4,000 per month beginning December 12, 1956. The aforementioned balance of $50,000 was to be secured by a deed of trust on the property.

(3) All instruments necessary to perfect title and a deed executed by the record owner were to be supplied by Merrill and Snary.

(4) Southwest was to procure assurance of title in the form of a standard C.L.T.A. Policy of Title Insurance issued by Title showing record title vested in the Wallace group free of all encumbrances except those then of record, current property taxes, and "also subject to an oil and mineral reservation as reserved of record by prior owners of the land, said reservation excludes or waives any right of entry to the surface of the land herein described; THIS is subject to buyers approval prior to close of escrow."

(5) Taxes, insurance, and interest on the $50,000 note to be executed by the purchasers were to be prorated *as of the date of possession.*

On or about July 5, 1956, it was agreed by the joint venture and the Wallace group that the latter were to be given the right of possession of the property as of July 5, 1956. In accordance with the option agreement the Wallace group paid the joint venture $25,000— $15,000 on May 28, 1956, and $10,000 on July 16, 1956—in connection with this agreement.

During August, September, and October, Stationers had all of its office furniture inventory, which consisted of approximately five or six carloads, shipped to the property and stored there. Each carload represented from $10,000 to $12,000 in terms of inventory value. The average inventory of Stationers during 1956 was approximately $300,000.

The repairs and other work on the property that the joint venture agreed to perform under the option agreement were commenced in the latter part of May 1956 by Ted F. Merrill & Sons, a general contracting firm which Merrill operated as a sole proprietorship, on behalf of the joint venture. This work was fully completed prior to September 5, 1956.

On July 17, 1956, the Wallace group entered into a written agreement with Ted F. Merrill & Sons to make certain repairs, improve-

ments, and additions to the property for the amount of $21,620; and it was further provided that Ted F. Merrill & Sons would perform asphalt concrete work at cost plus 20 percent. During the period July 17, 1956, to December 31, 1956, the Wallace group entered into oral agreements with Ted F. Merrill & Sons for other work on the property. Approximately 65 percent of all the work that the Wallace group contracted with Ted F. Merrill & Sons was completed by September 30, 1956, approximately 85 percent was completed by October 31, 1956, substantially all was completed by December 31, 1956. Pursuant to an agreement on August 1, 1956, between the Wallace group and Stationers that Stationers would incur and pay all costs of leasehold improvements, Stationers made payments for the work done on the property by Ted F. Merrill & Sons as follows:

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| Aug. 14, 1956 | $10,000 | Dec. 17, 1956 | $5,000.00 |
| Sept. 25, 1956 | 7,500 | Feb. 18, 1957 | 7,500.00 |
| Oct. 24, 1956 | 5,000 | Mar. 20, 1957 | 1,102.56 |

The total cost of the work done on the property by Ted F. Merrill & Sons for the Wallace group was $36,102.56, and the final statement of Ted F. Merrill & Sons to the Wallace group with respect to this work was dated February 12, 1957.

Stationers expended approximately $91,000, including the $36,000 paid to Ted F. Merrill & Sons, in order to repair, renovate, permanently improve, furnish, and move into the property. Of this $91,000, approximately 70 percent thereof was incurred by Stationers on or before September 30, 1956, and approximately 90 percent thereof was so incurred on or before October 31, 1956.

On August 17, 1956, a preliminary title report with respect to the property was obtained by Southwest from Title. Title at that time was prepared to issue a title insurance policy conforming to the escrow instructions upon recordation of the deed, subject only to the nonexistence of new encumbrances during the period August 16, 1956, to date of recordation.

On August 16, 1956, and November 15, 1956, the Wallace group made payments of $50,000 and $100,000, respectively, with respect to the purchase of the property, to Southwest. These payments were each accompanied by an amendment to the escrow instructions bearing the same dates. These amendments to instructions provided that the aforementioned payments could be disbursed in accordance with the written instructions of Merrill and Snary, and further provided that Southwest was relieved of any liability in connection with the disbursements of funds.

On or about August 20, 1956, Southwest received a letter dated August 20, 1956, signed by Merrill, Snary, and Petteys authorizing

Southwest to disburse $49,000 of the $50,000 payment by the Wallace group on August 16, 1956, as follows:

| | |
|---|---:|
| Merrill | $9, 000 |
| Robert Dodds (finder's fee on account) | 4, 000 |
| Snary | 9, 000 |
| Petteys | 18, 000 |
| Colorado for payments on the deed of trust at $3,000 each, for the months of September, October, and November 1956 | 9, 000 |
| Total | 49, 000 |

All of the above disbursements were made on August 20, 1956.

On or about November 19, 1956, Southwest received a letter dated November 19, 1956, signed by Merrill and Snary which letter authorized Southwest to disburse $58,000 of the $100,000 payment made by the Wallace group on November 15, 1956, as follows:

| | |
|---|---:|
| Robert Dodds (finder's fee on account) | $5, 000 |
| Petteys | 26, 500 |
| Snary | 13, 250 |
| Merrill | 13, 250 |
| Total | 58, 000 |

The amendment to instructions accompanying the Wallace group's $100,000 payment of November 15, 1956, also provided, *inter alia*, (1) that possession date was July 5, 1956, and all prorations were to be from that date, (2) that the deed of trust and note originally executed by the Wallace group was to be canceled and that a new note and deed of trust in favor of Colorado was to be substituted,[3] and (3) that the Wallace group approved the title report with respect to the property issued by Title as of August 16, 1956, and that Southwest was authorized to close the escrow on the basis of this report.

On November 2, 1956, Fred Wallace wrote a letter to Merrill requesting an extension of the escrow until the Wallace group received payment from the State of California for their Venice property. At no time during the period July 5, 1956, to November 15, 1956, did the Wallace group as individuals have the necessary $100,000 to complete the escrow. Stationers also did not have any funds free of commitments in that amount. In order to pay the final $100,000 payment into escrow the Wallace group had to arrange financing with a bank.

---

[3] At some time subsequent to the execution of the escrow instructions dated July 5, 1956, by the joint venture and the Wallace group, the joint venture and Colorado agreed that the joint venture would reduce the balance due on its note to Sunset (predecessor to Colorado) to $50,000 and then that Colorado would be substituted as the payee of the $50,000 note and deed of trust executed by the Wallace group in favor of the joint venture and the note from the joint venture to Sunset would be canceled. On December 10, 1956, the joint venture paid into escrow the sum of $1,503.46 representing the amount necessary to reduce to $50,000 the principal balance of the note and deed of trust arising from the purchase of the property by the joint venture.

On November 23, 1956, the Wallace group paid into escrow the sum of $6,123.84 as their final payment into escrow. A grant deed to the property, dated July 5, 1956, and executed on or about the same date by Merrill and Snary on behalf of the joint venture in favor of the Wallace group as grantees, was recorded on November 27, 1956. The deed of trust on the property executed by the Wallace group in favor of Colorado [4] was also recorded on November 27, 1956.

On or about May 3, 1956, the joint venture obtained and paid for a 3-year fire insurance policy on the property in the face amount of $250,000 to run from May 3, 1956, to May 3, 1959. The total premium for the policy was $2,382.50. This amount was prorated as of July 5, 1956, in accordance with the escrow instructions dated July 5, 1956. The Wallace group did not take out additional insurance but assumed this policy.

The parties have stipulated that the property was section 1231 property.

OPINION

The only issue for decision is whether the joint venture held the property for more than 6 months so that Merrill's profit from its sale is taxable as long-term capital gain under section 1231.[5] Neither section 1231 nor sections 1221–23 define the term "held," nor discuss "holding period" except under the specific circumstances set out in section 1223, which are not pertinent here; nor do the Commissioner's regulations.

In *McFeely* v. *Commissioner*, 296 U.S. 102 (1935), the Supreme Court equated the word "held," as used in section 101(c)(8) of the Revenue Act of 1928, defining capital assets as property held by the taxpayer for more than 2 years, with "ownership," saying:

In common understanding, to hold property is to own it. In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding. * * *

The Court also found the scheme under which title to personal property passed from a decedent to a legatee under local law to be immaterial in determining the date of acquisition of the property by the legatee under that section of the Revenue Act—the date of acqui-

---

[4] See footnote 3.
[5] SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—* * * the recognized gains on sales * * * of property used in the trade or business * * * shall be considered as gains * * * from sales * * * of capital assets held for more than 6 months. * * *

* * * * * * *

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) * * * "property used in the trade or business" means * * * held for more than 6 months * * *

sition being the date of decedent's death within the intent of the Revenue Act. And in *Helvering* v. *San Joaquin Co.*, 297 U.S. 496 (1936), the Court also looked to common usage for the meaning of the term "acquired" as used in the taxing statute and found it to mean "obtained as one's own."

We have found no case precisely in point on the question of when the holding period begins or ends in a situation such as we have here, although *W. H. Hay*, 25 B.T.A. 96 (1932), is factually similar with respect to the end of the period. However, in view of the congressional purpose in enacting the capital gains provisions, the above cases, and other cases such as *Commissioner* v. *Union Pac. R. Co.*, 86 F. 2d 637 (C.A. 2, 1936), affirming 32 B.T.A. 383 (1935) ; *North Carolina Lumber Co.*, 19 T.C. 587 (1952), reversed on other issues 211 F. 2d 543 (C.A. 4, 1954), which were concerned with the taxable year in which gain was realized, and *Moore* v. *Commissioner*, 124 F. 2d 991 (C.A. 7, 1941), affirming in part and reversing in part 42 B.T.A. 949 (1940), *De Guire* v. *Higgins*, 159 F. 2d 921 (C.A. 2, 1947), and *2 Lexington Avenue Corp.*, 26 T.C. 816 (1956), which were concerned with the person to whom income from property sold under contract with title retained as security for the purchase price was taxable, we believe we must take into consideration in determining a taxpayer's holding period for purposes of section 1231 not only the dates on which bare legal title to the property passed but also the dates on which the benefits and burdens or the incidents of ownership of the property were acquired and disposed of in a closed transaction.

It is recognized that property, in the legal sense, means not the thing itself, but the rights which inhere in it. See Brown, Personal Property, sec. 5 (2d ed. 1955). Ownership of property is not a single indivisible concept but a collection or bundle of rights with respect to the property. Normally, ownership of real estate would be considered transferred on the date of delivery of the deed. But where delivery of the deed is delayed to secure payment of the purchase price or for some other reason such as the escrow arrangement here involved, we believe the intent of the parties as to when the benefits and burdens of ownership of the property are to be transferred, as evidenced by factors other than passage of bare legal title, must control for purposes of this statute.

In *Commissioner* v. *Union Pac. R. Co.*, *supra* at 639, the Court of Appeals for the Second Circuit said :

A closed transaction for tax purposes results from a contract of sale which is absolute and unconditional on the part of the seller to deliver to the buyer a deed upon payment of the consideration and by which the purchaser secures immediate possession and exercises all the rights of ownership. The delivery of a deed may be postponed and payment of part of the purchase price may be deferred by

installment payments; but for taxing purposes it is enough if the vendor obtains under the contract the unqualified right to recover the consideration. [Cits. omitted.]

Applying the above test to the facts before us, we do not think the joint venture acquired the property until at least April 27, 1956, when Sunset's directors and stockholders authorized the acceptance of the joint venture's offer to purchase the property and the appropriate officers of Sunset signed the escrow instructions dated April 20, 1956.

Merrill made an offer to purchase the property (whether on behalf of himself, the joint venture, or the Merrill Investment Co., Inc., which company or corporation was never formed, is somewhat vague) sometime in December 1955 or January 1956 and apparently received a favorable reply from someone at that time. The joint venture received what purportedly was rent from the Underwriters Salvage Company for use of the property during the period February 15, 1956, to July 1, 1956. The record, however, contains no further evidence as to the nature of the joint venture's interest in the property prior to April 27, 1956, the offer was apparently not presented to or accepted by the directors and stockholders of Sunset until that time, and no written agreement was entered into by the parties prior to that time. In view of these circumstances, we do not think a finding that the joint venture's holding period began prior to April 27, 1956, is justifiable.

The remaining question for decision is when did the joint venture's holding period for the property end? On or about April 16, 1956, the Wallace group paid the joint venture $25,000 for a 90-day option to purchase the property for $250,000, the $25,000 to be applied against the purchase price if the option was exercised. On June 20, 1956, the option was exercised and on July 5, 1956, the parties signed written escrow instructions for the purpose of consummating the sale. On or about July 5, 1956, Merrill and Snary executed a deed dated July 5, 1956, which they deposited with the escrow agent. The Wallace group acquired possession of the property as of July 5, 1956, for payment of an additional $25,000 of the purchase price, and in July and August 1956 they and Stationers commenced exercising their possessory rights by making repairs and improvements at their own expense and by use of the property for storage of a portion of Stationers' inventory. The Wallace group's assumption of possession on July 5, 1956, carried with it the assumption of taxes and insurance premiums on the property, and the interest on their $50,000 purchase money note was to be computed from that same date. As of the date of possession they assumed the risk of loss of improvements. Cal. Civ. Code, sec. 1662.

We think that as of this time the parties intended the contract to be, and it was, an unconditional contract of sale and that they considered it to be a closed transaction at that time. Wallace so testified

and petitioner did not deny it. The only thing remaining to be done by the joint venture was to perform certain repair work and to present an insurable title. As a practical matter the joint venture had received a policy of title insurance on the same property from the same title company just 2 months previously. The only thing remaining to be done by the purchasers was to pay the purchase price in the manner called for in the agreement.

On August 16, 1956, the Wallace group paid an additional $50,000 of the purchase price to Southwest with instructions that this money could be disbursed pursuant to the instructions of Merrill and Snary. Pursuant to Merrill's and Snary's instructions, $49,000 of the $50,000 was disbursed to Merrill, Snary, and others on August 20, 1956.

By September 5, 1956, all the repairs and improvements to the property that the joint venture agreed to perform were completed.

We think that for all intents and purposes the Wallace group were the owners of the property not later than September 5, 1956. See *In re Reid's Estate*, 26 Cal. 2d 362, 79 P. 2d 451 (1938); *Havens* v. *Alameda County*, 30 Cal. App. 206, 157 Pac. 821 (1916); 1 Tiffany, Real Property, sec 307 (3d ed. 1939). As of that date they had assumed almost all the incidents, both beneficial and detrimental, of total ownership and subject to their tender of the remainder of the purchase price, they could have forced conveyance of the legal title. Cal. Civ. Code, secs. 3384 *et seq.; Groobman* v. *Kirk*, 159 Cal. 2d 117, 323 P. 2d 867 (1958).

As of September 5, 1956, the joint venture had already received one-half of the purchase price that was to be paid in cash. The testimony of Fred Wallace convinces us that at least by September 5 his group and the business of Stationers were wholly committed to and dependant upon the acquisition of the property, and the record as a whole does not convince us that they were not financially responsible for the remaining portion of the purchase price.

As of September 5, 1956, the only conditions precedent to the joint venture's claim for the total purchase price were the passage of time and the issuance of a title insurance policy pursuant to the escrow instructions, which Title had been prepared to issue as of August 17, 1956, subject only to the nonexistence of new encumbrances during the period August 16, 1956, to the date of recordation of the deed. As of that date the joint venture's profit on the sale was fixed. Compare *Samuel C. Chapin*, 12 T.C. 235 (1949), affd. 180 F. 2d 140 (C.A. 8, 1950). Any appreciation or depreciation of the property's value after that date would have been for all intents and purposes to the benefit or detriment of the Wallace group. See *Brewster* v. *Gage*, 280 U.S. 327 (1930); *Commissioner* v. *Tyng*, 106 F. 2d 55, 61 (C.A. 2, 1939), reversed and remanded on other issues 308 U.S. 527 (1940). In the light of all these circumstances we think the joint venture's holding

period for the property ended no later than September 5, 1956. *Commissioner* v. *North Jersey T. Ins. Co.*, 79 F. 2d 492 (C.A. 3, 1935), affirming a Memorandum Opinion of this Court; *W. H. Hay, supra; Peavey* v. *United States*, 214 F. Supp. 934 (D. Kan. 1963). See also Rev. Rul. 54–607, 1954–2 C.B. 177.

In reaching this decision we have considered petitioners' contention that the holding period did not end until at least November 16, 1956, because that was the earliest date under California law that legal title to the property could have passed, citing Cal. Civ. Code, secs. 1054 *et seq.* Were we convinced that the date of transfer of legal title alone was conclusive we would look to California law for that date but we do not agree that the technical refinements of legal title alone determine when a taxpayer's holding period with respect to real property ends for purposes of this statute. *Helvering* v. *Gambrill*, 313 U.S. 11 (1941); *Commissioner* v. *Union Pac. R. Co., supra; Moore* v. *Commissioner, supra; DeGuire* v. *Higgins, supra; 2 Lexington Avenue Corp., supra.* Perhaps it would be tidier and more precise if such were the case. But, if that were the case it would be possible for a taxpayer to buy a capital asset one day, sell it the next day at a profit under an escrow agreement which gave the purchaser all the benefits and burdens of ownership immediately but which did not call for delivery of a deed for more than 6 months, and thus get the advantages of the long-term capital gains provisions. We do not think this was intended by Congress.

We have considered all the cases relied upon by petitioners, but we do not feel that they require a different result. The case cited by petitioners which seems to be the most analagous to the instant case is *Albert E. Dyke*, 6 T.C. 1134 (1946), where this Court held that the sale determining the end of a taxpayer's holding period for stock which had been deposited with an escrow agent until the conditions of the sale had been fulfilled did not occur until those conditions had been fulfilled. The conditions precedent to the consummation of the sale in *Dyke*, however, were considerably more complex than those in the instant case and included, *inter alia*, authorization of the sale by the Interstate Commerce Commission. The taxpayer seller in *Dyke* also retained the incidents of ownership and received no part of the purchase price until the close of the escrow. Here we believe the escrow was extended only to give the Wallace group additional time to obtain the purchase price from the condemnation of their Venice property. Compare also *Morco Corporation* v. *Commissioner*, 300 F. 2d 245 (C.A. 2, 1962), affirming per curiam a Memorandum Opinion of this Court; *Swenson* v. *Commissioner*, 309 F. 2d 672 (C.A. 8, 1962), reversing 37 T.C. 124 (1961).

As the court said in *Texon Oil & Land Co. of Texas* v. *United States*, 115 F. 2d 647, 650 (C.A. 5, 1940), upon which this Court pri-

marily relied in *Dyke*, "taxation is a practical matter." We think as a practical matter the instant case is more analagous to those cases wherein the seller retained legal title to property as a security device until the payment of the purchase price. *Mayer* v. *Donnelly*, 247 F. 2d 322 (C.A. 5, 1957); *Commissioner* v. *Tyng, supra; Commissioner* v. *Union Pac. R. Co., supra; W. H. Hay, supra.*

In view of concessions made by the parties on other issues,

*Decision will be entered under Rule 50.*