I. FRED WHITE and LILIAN M. WHITE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
White v. Commissioner
Docket No. 6242-71
United States Tax Court
T.C. Memo 1974-69; 1974 Tax Ct. Memo LEXIS 250; 33 T.C.M. (CCH) 330; T.C.M. (RIA) 74069; March 25, 1974, Filed. *250 Petitioner's corporation entered into possession, and assumed the burdens and benefits of ownership, of encumbered real property and an unencumbered leasehold interest, under a 1960 installment land contract, with the sellers retaining title for security purposes, and the purchaser assuming no liability under the encumbrances but agreeing to pay $60,000.Possession passed to petitioner in 1961 through corporate liquidation. In 1966, by agreement, petitioner returned possession of the encumbered property to the sellers, retaining the leasehold and being excused from payment of the then unpaid $44,413.11 of the purchase price. Held: Petitioner was, for tax purposes, the owner from 1961 to 1966 of the property returned. Held, further, the repossession of the returned property constituted a sale or exchange by petitioner, giving rise to gain in the amount of the excess of the forgiven portion of the purchase price over petitioner's adjusted basis in the property returned. I. Fred White, pro se. Richard H. Gannon, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency 1966
$1,210.88
1968
253.66
$1,464.54
Petitioner, successor in interest to the purchaser of real property in possession under a 1960 land sales contract (including a leasehold and furniture), in 1966 entered into a Release Agreement whereby the sellers released him from further payment obligations in exchange for (1) petitioner's return to the sellers of possession of the property (except the leasehold interest and the furniture), and (2) execution and delivery by petitioner to the sellers of his promissory note for $1,000. The issues are (1) the tax consequences to petitioners of the 1966 Release Agreement, and (2) whether payment of the $1,000 note is deductible in 1968. FINDINGS OF FACT Some of the facts *253 have been stipulated by the parties and are found accordingly. Petitioners are husband and wife, and, at the time they filed their petition in this case, they resided in Studio City, California. Their joint Federal income tax returns for the years in issue were filed with the district director in Reno, Nevada. On June 25, 1960, I. Fred White (hereinafter "petitioner") formed G & F, Inc., a Nevada corporation, acquiring and thereafter retaining 100 percent of the corporation's stock. [1] On July 22, 1960, G & F, Inc. ("Buyer") and Frank J. and Jessie Camuglia ("Seller") entered into an Agreement whereby Buyer agreed to purchase and Seller agreed to sell certain improved real property and furniture, and Seller agreed to assign his leasehold interest in certain other improved property, for a total consideration of $60,000, payable at the rate of $550 a month. Receipt of $157.50 (representing a pro rata payment by Buyer for the period July 22 to July 31, 1960) was acknowledged in the Agreement. *254 The $550 monthly payment was to be applied as follows: (a) $170 on a promissory note, secured by deed of trust on the improved real property sold Buyer, payable to First National Bank of Nevada, on which there was an unpaid principal balance of $8,460.40 as of July 22, 1960; (b) $170 on a "certain indebtedness" against the same property, in the amount of $33,075.36 as of July 22, 1960; and (c) $210 to Seller, to be credited first to interest on Seller's equity at 7 percent per annum on the unpaid balance, and the remainder to reduce Seller's equity of $18,464.24. Furthermore, Buyer agreed to abide by and be bound by all the terms and conditions of the lease and renewals thereof, to make monthly rental payments of $250, and in event of default under the lease to assign the leasehold interest back to Seller. The Agreement further provided that when Seller's equity was reduced to $10,000, (1) Buyer would execute a promissory note for $10,000, payable in monthly installments of $250 (including 7 percent interest), secured by a deed of trust on the improved real property; (2) at that point Buyer would assume the other encumbrances against that realty; (3) and at that same time *255 Seller would deliver to Buyer a Grant, Bargain and Sale Deed to the improved real property, free of all encumbrances except those noted in the Agreement, which "shall be substituted and take the place of this contract." Seller would also at that time execute a Bill of Sale for the furniture. [2]
In addition, Seller agreed to pay the real estate commission incurred in connection with the Agreement. Rents, taxes and insurance were pro rated as of July 22, 1960. Buyer agreed to maintain the same fire insurance coverage then in force, and assumed all liability for damage to or destruction of any improvements then on the land or thereafter placed on the land. All utility deposits were to remain in Seller's name until the premises were brought up to code standards approved by the Building Department of the City of Las Vegas, at which time they would be placed in Buyer's name and Buyer would pay *256 Seller the amount of such deposits. Moreover, Buyer would be entitled to a $6,000 credit against Seller's equity at such time as it brought both the purchased property and leasehold property up to code standards. Finally, the Agreement provided that if Buyer failed to make any payment under the Agreement when due, upon Seller giving Buyer 15 days written notice "Seller may elect to declare a forfeiture or cancel this contract, and, upon such election being made, all rights of [Buyer] hereunder shall cease and any payments heretofore made by [Buyer] shall be retained in liquidation of all damages sustained by reason of such failure." The purchased real property, located at 609 South 4th Street, Las Vegas, Nevada, had two duplexes and four individual cabins. The adjacent leasehold interest, at 608 and 614 Las Vegas Boulevard South, had two business buildings and a number of small cabins similar to those located on the purchased property. The two business buildings were subject to pre-existing rental agreements whereby the tenants were required to maintain the buildings. The cabins and duplexes located on both the purchased and leasehold properties were collectively known *257 as the El Tovar Motor Court. The furniture consisted of the furnishings of the 16 units of the motor court together with a few other miscellaneous items, such as bedding and a washing machine. The properties acquired under the Agreement with Seller were not Buyer's sole assets. Buyer also owned property located at 615 N. "E" St. in Las Vegas, and had a bank account. Buyer operated the motor court until March 18, 1961, at which time it ceased doing business. At this time petitioner quite informally personally assumed Buyer's obligations under the Agreement of July 22, 1960, and took possession of the El Tovar Motor Court and the furnishings thereof. [3]
On its only income tax return, covering its entire period of existence (June 25, 1960 to March 18, 1961) Buyer allocated the $60,000 purchase price to the properties acquired under the July 22, 1960 Agreement as follows: Buildings
$25,300
Furniture
1,200
Lease
26,500
Land
7,000
Total
$60,000
The corporation depreciated the buildings, which were approximately 40 years old in 1960, over a remaining useful life of eight *258 years, and the furniture over a remaining useful life of five years, applying to both the form of accelerated depreciation known as the 150 percent declining balance method. The lease was amortized at a rate of $500 per month over fifty-three months, the remaining term of the lease. The corporation's income tax return reported the following depreciation: Buildings
Original cost
$25,300
Less depreciation
(3,162)
Adjusted Basis
$22,138
Furniture
Original cost
$1,200
Less depreciation
(240)
Adjusted basis
$960
Lease
Original cost
$26,500
Less amortization
(4,000)
Adjusted basis
$22,500
The total deductions taken by the corporation on account of the properties purchased from Seller were $7,402, leaving an aggregate adjusted basis for the properties in the corporation's hands (including the land) of $52,598. Due in part to the depreciation and amortization deduction described above, Buyer reported a loss of $3,513.34. After March 18, 1961, petitioner depreciated the tangible assets, utilizing the same methods as had the corporation. Petitioner adopted the following bases: Buildings
$21,138
Furniture
1,060
Lease
22,500
Land
7,000
Total
$51,698
*259 Evidently, except for two unexplained discrepancies, petitioner simply carried over Buyer's adjusted bases. Why petitioner's basis for the buildings was reported as $1,000 below and that of the furniture was reported as $100 above Buyer's adjusted bases is nowhere indicated in the record. We find that the fair market value of the properties acquired by petitioner from Buyer equalled their basis in Buyer's hands at the time petitioner acquired them. In 1962 the term of the leasehold was extended by petitioner in his own name. The record does not indicate that there was any change in the rental or that any added amount was charged by the lessor for agreeing to the extension. Thereafter, the leasehold amortization claimed was reduced from $6,000 to $1,385 per year. By July 1965, petitioner could no longer make payments under the 1960 Agreement. Seller served several notices upon petitioner demanding that he either perform or vacate the premises. On February 17, 1966 petitioner entered into a Release Agreement with Seller, releasing "each other from the obligations of said [1960] Agreement" and cancelling the Agreement except as follows: (a) Petitioner will give Seller *260 his $1,000 promissory note, payable in two years and bearing interest at 6% per annum; and (b) Petitioner "is to be left in the quiet and peaceful occupancy and enjoyment" of the leasehold premises. Petitioner also was allowed to, and did, retain the furniture. He restored possession of the property at 609 South 4th Street to Seller. This allowed petitioner to continue to operate the motor court, albeit without the duplexes and cabins located on the 609 South 4th Street property. When petitioner took possession of the buildings in April 1961, the buildings had a remaining useful life of seven years on Buyer's books. Petitioner, however, thereafter computed depreciation on the buildings on the basis of a life of eight years commencing April 1961, when petitioner acquired the property. On brief, respondent stated that he did not quarrel with the useful life used by petitioner, although he then furnished the Court with computations based on a seven year life. We find that the buildings had a useful life of eight years as of April 1961. The depreciation allowable on the buildings, based on petitioner's 150 percent declining balance method, an eight-year useful life commencing *261 April 1, 1961, and an original basis to petitioner of $22,138 (rather than the $21,138 used by petitioner) over the period from March 18, 1961 to December 31, 1965, was $13,846, computed as follows: Original basis
$22,138
1961:
1/8 X 150% X 9/12 (14.0625%)
(3,113)
December 31, 1961 adjusted basis
19,025
1962:
1/8 X 150% (18.75%)
(3,567)
December 31, 1962 adjusted basis
15,458
1963:
18.75%
(2,898)
December 31, 1963 adjusted basis
12,560
1964:
18.75%
(2,355)
December 31, 1964 adjusted basis
10,205
1965:
18.75%
(1,913)
December 31, 1965 adjusted basis
$ 8,292
Original basis
$22,138
December 31, 1965 adjusted basis
(8,292)
Total depreciation allowable
$13,846
On their 1966 tax return, petitioners deducted $15,586.89 as a "loss from cancellation of contract of sale," attaching the following schedule to their return (which is in evidence): LOSS ON CONTRACT, seller voided contract due to delinquent payments: On property at 609 South 4th St., Las Vegas, Nevada 89101; Contract of sale was entered into by seller (Frank Camuglia) on July 22, 1962 (sic), for a price of
$60,000.00
2-17-66, the owner (Frank Camuglia) voided the contract, and took possession of the property, based on delinquent payments due.
Balances yet due on 2-17-66: Frank Camuglia (owner)
11,745.58
Willis Robinson, 1st TD holder
32,667.53
44,413.11
AMOUNT I PAID ON PRINCIPAL (LOSS)
15,586.89
*262 We find, in the absence of contrary evidence that on February 17, 1966 the unpaid balance was $44,413.11. In 1968 petitioner paid $1,000 to the Camuglias in full payment of his $1,000 note executed in 1966. Petitioners deducted this sum on their 1968 income tax return as a business expense. Respondent determined deficiencies in the petitioners' income taxes for 1966 and 1968 calculated on the assumption that petitioner had returned to Seller the furniture and the leasehold as well as the buildings and the land at 609 South 4th Street in 1966. However, at trial petitioner testified that he retained the leasehold and the furniture. Thereafter, respondent filed an amendment to his answer to conform the pleadings to the proof in which an additional $1,914.86 deficiency for 1966 was determined. [4] In respondent's amended answer, the entire $1,000 promissory note is treated as attributable to the property surrendered rather than being apportioned between it and the leasehold and furniture retained. Since such treatment minimizes petitioners' gain for purposes of this case, and petitioners have not complained of such treatment, we find that the $1,000 represented furhter payment *263 for the property surrendered. OPINION Petitioner contends that the 1960 Agreement did not result in a sale of property, that the Release Agreement did not result in a reconveyance of property, and that he had paid only for possession of the property; therefore, he concludes, he was entitled to an ordinary loss on entering into the Release Agreement which deprived him for further possession. Petitioner, an accountant, makes this contention in the face of the fact that both he and his corporation had regularly deducted depreciation on this property. Respondent contends that the 1960 Agreement resulted in a sale of the property to petitioner's corporation, that petitioner obtained the property as a liquidating distribution from his wholly-owned corporation, and that he reconveyed the property to Seller plus a note for $1,000 in exchange for release of his purchase money obligation, thereby realizing gain to the extent the purchase money obligation of which he was relieved *264 exceeded his adjusted basis in the property plus his $1,000 note. We agree with respondent. Petitioner's wholly-owned corporation (Buyer) entered into an Agreement on July 22, 1960 to buy certain improved property at 609 South 4th Street in the City of Las Vegas. The first question we must decide is whether that Agreement resulted in a sale of that realty, as respondent contends, or was merely an agreement to purchase it, as petitioners assert. We hold that a sale of the property took place on the date of the Agreement. On that date, pursuant to the Agreement, Buyer went into immediate possession and control of the property and operated it as part of a motor court business. Buyer became liable for the taxes on the property and entitled to rents derived therefrom.Buyer was required to carry fire insurance on the property and assumed all liability for damage to or destruction of the improvements thereon. On the other hand, under the Agreement record title was to remain in Seller until Seller's equity had been reduced by Buyer's payments of principal from $18,464 to $10,000, at which time Seller was to transfer title to Buyer, subject to certain encumbrances, which Buyer was *265 to assume. However, clearly the benefits and burdens of ownership passed to Buyer at the time it entered into the Agreement, even though (1) title remained in Seller, (2) Buyer at that time did not assume the encumbrances on the property, and (3) in the event of default Seller had the election of keeping the amounts previously paid and reacquiring the property. Retention of the title was a mere security device; once Buyer had paid a certain percentage of the purchase price, Seller was to deliver title. See Ted F. Merrill, 40 T.C. 66 (1963), affirmed per curiam 336 F.2d 771 (C.A. 9, 1964); Commissioner v. Union Pac. R. Co., 86 F.2d 637, 639 (C.A. 2, 1936), affirming 32 B.T.A. 383 (1935). We recognize that in E. F. Baertschi, 49 T.C. 289 (1967), [5] this Court held, in a divided reviewed opinion, that a taxpayer in possession of real property under a non-recourse land purchase agreement did not become the owner thereof until title passed to him, because the absence of personal liability to pay the purchase price made the purchaser's obligation "conditional." However, the Baertschi case is distinguishable from this case *266 in that there is no showing here that Buyer's obligation to Seller was non-recourse. True, the purchase agreement provided that the Seller could elect to repossess, and declare forfeited all principal payments theretofore made, with the necessary implication that Buyer would thereupon be excused from further payments. But nothing in the Agreement expressly precluded Seller from leaving Buyer in possession and insisting upon payment of the agreed price. On the informal liquidation, for all that appears in the record, petitioner assumed or inherited his corporation's responsibilities under the contract of sale, or at the least acquired assets as a transferee of sufficient value to support payment of the remainder of the agreed price. Petitioner, who has the burden of proof, has not demonstrated that his obligation to Seller was non-recourse. Therefore, Baertschi is inapplicable. The corporation operated *267 the property until March 18, 1961, when the corporation ceased doing business, informally liquidated, and transferred the property in question to petitioner, its sole stockholder. Section 344(a) [6] provides that if property is received in a distribution in complete liquidation of a corporation, and if gain or loss is recognized on receipt of such property, then the basis of the property in the hands of the distributee shall be the fair market value of such property at the time of the distribution. (Emphasis added.) Although gain or loss was recognized, no gain or loss was in fact reported. However, mere failure to report realized and recognized gain or loss does not bar the application of section 334(a). We have found as a fact that the adjusted bases of the properties in the corporation's hands equalled their then fair market value. Therefore, petitioner's bases for the properties received on liquidation of the corporation were as follows: Buildings
$22,138
Furniture
960
Lease
22,500
Land
7,000
Total
$52,598
Petitioner depreciated the buildings *268 during the years 1961 through 1965 using the 150 percent declining balance method of depreciation. However, petitioner used an original basis of $21,138, and we have found that the buildings' fair market value as of the date of liquidation was $22,138. This was petitioner's original basis in the buildings. Petitioner's original basis must be adjusted for the full amount of allowable depreciation for the years 1961 through 1965 (section 1016(a) (2)), or $13,846, since this figure exceeds the depreciation allowed. Petitioner's adjusted basis in the buildings on February 17, 1966, was $8,292 ($22,138 less $13,846). Respondent, on brief, attacks petitioner's use of the 150 percent declining balance method, claiming that under section 167(c) during the years 1961 through 1965 accelerated depreciation was not permitted for property the original use of which did not commence with the owner. While original use of the property in question did not commence with petitioner, nor with his corporation, respondent is in error in his interpretation of section 167(c). It was well-established under respondent's own ruling that, prior to 1969, used property could be depreciated on the 150 percent *269 declining balance method, where such method yields a "reasonable allowance." Rev. Rul. 57-352, 1957-2 C.B. 150; Silver Queen Motel, 55 T.C. 1101 (1971). Since respondent failed to cite or discuss these authorities on brief, we assume that his failure to follow them stems from inadvertence rather than disagreement therewith or a view that the method did not yield a "reasonable allowance." On February 17, 1966, petitioner and the Camuglias (Seller) entered into a Release Agreement, as a result of which petitioner returned possession of the purchased real estate (609 South 4th Street) to Seller, but continued in possession of the leasehold and the furniture; Seller retained petitioner's previous principal payments ($15,586.89) and released petitioner from the obligation to make further payments under the 1960 Agreement; and petitioner gave Seller his promissory note for $1,000 payable in 1968. The return of the purchased real property constituted a sale or exchange, since, as we have held, the earlier transaction was a purchase, making petitioner the owner of the property for tax purposes. The gain petitioner realized from the sale or exchange of the property *270 was the excess of the amount petitioner realized over the adjusted basis in his hands of the property relinquished. Section 1001(a). The amount realized in this case equalled the unpaid and forgiven portion of the $60,000 purchase price, i.e., the indebtedness of which petitioner was relieved and to which property in his hands ceased to be subject, or $44,413. Woodsam Associates v. Commissioner, 198 F.2d 357 (C.A. 2, 1952), affirming 16 T.C. 649 (1951); cf. Parker v. Delaney, 186 F.2d 455 (C.A. 1, 1950), certiorari denied 341 U.S. 926 (1951). The gain realized by petitioner as a result of the Release Agreement was $28,121, calculated as follows: Amount realized (liability released)
$44,413
Less property transferred: Land
$7,000
Buildings
$22,138
Less depreciation allowable
(13,846)
8,292
Note
1,000
(16,292)
$28,121
The improved real property resold to Seller was used in petitioner's trade or business of operating a motor court and had been held by him for more than six months. Respondent makes no contention that section 1250 applies to any portion of the gain. Therefore, in *271 accordance with section 1231, the gain realized is considered as long-term capital gain. Respondent does not contend otherwise. Having concluded that the $1,000 note represented property transferred in reduction of the amount realized under the Release Agreement, we hold that petitioners are not entitled to deduct the $1,000 in 1968 when the note was paid. Decision will be entered under Rule 155. Footnotes
1. 1. According to the 1961 corporate income tax return, petitioner and one George Goss each owned 50 percent of the stock of G & F, Inc. However, the parties herein have stipulated that petitioner was the sole owner, and we so find. ↩
2. The inventory (furniture) is described as that listed on Exhibit A in one place in the Agreement and on Exhibit B in another place. Neither exhibit is attached to the Agreement as placed in evidence. For purposes of this case, we find that both exhibits refer to the same furniture. ↩
3. The record does not disclose what happened to the other corporate assets. ↩
4. Respondent concedes that since petitioner retained possession of the leasehold subsequent to the 1966 release, he is entitled to amortization deductions for each year in issue in the amount of $1,385. ↩
5. Our opinion in Baertschi was reversed by the Court of Appeals for the 6th Circuit (412 F.2d 494↩ (1969)), not the circuit to which appeal would lie herein, and this Court has not since had an occasion to express itself on whether this reversal should be followed. 6. All section references are to the Internal Revenue Code of 1954, as in effect in the years in issue. ↩